STATE OF MAINE                                    SUPERIOR COURT
YORK, ss.                                         CIVIL ACTION
                                                  DOCKET NO. CV-14-157

KELLEY ANN O'SHEA,                    )
                                      )
        Plaintiff,                    )
                                      )
        v.                            )          JUDGMENT
                                      )
KATHLEEN M. O'SHEA; BRIAN             )
CONNOR O'SHEA; JOHN J.C. O'SHEA,      )
III; and KILLYBEGS, LLC,              )
                                      )
        Defendants.                   )
                                      )

Plaintiff Kelley O'Shea ("Kelley"), in her individual capacity and as co-trustee of two trusts

("Trusts") established by the late John J.C. "Rusty" O'Shea in his Last Will and Testament,

brought this action in August 2014 for breach of fiduciary duty, breach of contract, fraud,

conversion, and alleged violations of the Maine Uniform Fraudulent Transfers Act ("UFTA")

against Kathleen O'Shea ("Kathleen"), in her individual capacity, as co-executor of the estate of

Rita O'Shea ("Rita"), as co-trustee of the Trusts, and as a manager of Killybegs, LLC; Brian

O'Shea ("Brian"), in his individual capacity, as co-executor of Rita's estate, as co-trustee of the

Trusts, and as a manager of Killybegs; John O'Shea ("John"), in his individual capacity, as co-

trustee of the Trusts, and as a manager of Killybegs; and against Killybegs itself.

In particular, Kelley seeks recovery for alleged breach of fiduciary duty to the Trusts and

Rusty's estate by Rita, the parties' mother and the primary beneficiary of and trustee for the

Trusts (Count I); breach of contract by Kathleen, Brian and Killybegs (Count II); breach of

fiduciary duty by Kathleen, Brian, and John (collectively "Individual Defendants") as members

1

of Killybegs (Count III); breach of fiduciary duty by Killybegs itself (Count IV),[1] and fraud (Count V), conversion (Count VI), and violations of the UFTA (Count VII) by the Individual Defendants. She asks this court to provide relief in the form of a constructive trust (Count VIII) and punitive damages (Count IX). Although not listed in the complaint, Kelley also seeks a judgment (1) declaring that Rita did not satisfy the terms of a final judgment entered by the 237th District Court of Lubbock County, Texas in 2011; (2) ordering Rita's estate to reimburse the Trusts for the amount she distributed or allocated to cover her attorneys' fees in that case; (3) ordering the defendants to pay Kelley's attorneys' fees in this litigation; (4) cancelling the deed that conveyed the Trusts' one-half interest in real property in Kennebunkport, Maine into Killybegs in 2009; (5) cancelling the change of beneficiary forms Rita executed for the two life insurance policies; and (6) appointing a conservator to manage Rita's remaining assets and Rusty's estate.

The Superior Court (*O'Neil, J.*) issued an order on April 4, 2018 in which it granted in part and denied in part defendants' motion for summary judgment, holding, *inter alia*, that the doctrine of res judicata barred any claims for distributions prior to the commencement of the litigation in Texas in October 2009 and any claims regarding a transfer in 2004 of property known as "Brehon" by Rita to Kathleen. *O'Shea v. O'Shea*, No. CV-14-157, 2018 Me. Super.

---

[1] There is a total absence of any discussion in Kelley's post-trial brief or her reply brief on this cause of action. (Pl.'s Br. at 31 (limiting her recitation of the law and facts related to breach of fiduciary duty to actions by Kathleen and Brian); Pl.'s Reply Br. at 16 (moving from her breach of fiduciary duty claim against Kathleen and Brian on Count III to her claim against the Individual Defendants for fraudulent concealment on Count V).) Kelley has not cited to any Texas authority for the proposition that a limited liability company as an entity owes a fiduciary duty to its members or that it is liable for breaching that duty, assuming it exists. The Texas Business Organizations Code does not appear to burden the LLC itself with a fiduciary duty. *See* Tex. Bus. Orgs. Code § 101.401 (referencing only the duties owned by a "member, manager, officer or other person" in its discussion of which duties can be expanded or restricted by a company agreement). Because Kelley has failed to prosecute this claim in a meaningful way at trial or through her post-trial briefs, the court will not discuss its merits further.

2

LEXIS 190, at **22, 24 (Apr. 4, 2018). The court held a bench trial on the remaining claims from June 24 to June 27, 2019 at which it entertained testimony for the plaintiff from Kelley and her financial expert, Roderick Moe, and for the defendants from Kathleen; Brian; John; Gary Lane, a certified financial planner who has served as an accountant to Rita, the Trusts and Killybegs; and Michael Gomez, a financial advisor to the Trusts since 2009. The parties submitted written closing arguments in the form of post-trial briefs. This decision follows.

## I. Findings of Facts

The facts that gave rise to this action begin with Rusty's death on November 10, 1996. (Trial Transcript, hereinafter "Tr.," 1 at 11:16, 165:12.) He was survived by his wife, Rita and four children, including the plaintiff and Individual Defendants. (Tr. 1 at 165:22–166:7.) Rusty's estate was probated in Lubbock County, Texas, which is where he and Rita primarily resided. (Defs.' Ex. 1 at DEF-0001.) Since Texas is a community property state, half of the marital estate remained with Rita as the surviving spouse while Rusty's half passed according to the terms of his Last Will and Testament ("Rusty's Will" or "Will"). *See* Tex. Fam. Code Ann. § 3.002.

## A. The Trusts

Rusty's Will established two support trusts:[2] the Family Trust ("Family Trust") and the Marital Deduction Trust ("Marital Trust"). (Pl.'s Ex. 1, hereinafter "Will," §§ 4.1, 6.1.) Gary Lane, a certified public accountant who started working for Rita in 1998 and continues to serve as the accountant for the Trusts and Killybegs, divided the one-half of the community property that belonged to Rusty into the two trusts in consultation with the lawyer working to probate his estate. (Tr. 3 at 62:17–20, 63:1–12, 66:4–7.) Lane funded the Family Trust with one-half of the

---

[2] This court sees no reason to deviate from the Texas Court of Appeals decision to classify the Trusts as "support trusts" given their expertise and experience in interpreting the Texas Trust Code. *Duncan v. O'Shea,* No. 07-11-0088-CV, 2012 Tex. App. LEXIS 64, at *13 (Tex. App. Aug. 7, 2012).

marital estate's interest in the home Rusty and Rita owned at 168 Kings Highway, Kennebunkport, Maine and the majority of their stocks that Lane believed were most likely to appreciate in value.[3] (Tr. 1 at 12:10–11; Tr. 3 at 66:8–67:1.) The Marital Trust's *corpus* was initially comprised of the remaining stocks and one-half of the couple's other real estate assets, including land in Hockley County, Texas, and Tarrant County, Texas and the following pieces of property in Lubbock, Texas: the family home and an adjacent lot; three barns for boarding horses and riding stables known as "Brehon"[4] sitting on roughly sixteen acres; an office building; and a parking lot. (Tr. 3 at 52:16–22, 57:10–12, 67:4–7; Defs.' Ex. 1 at DEF-0002.)

### 1. *The Family Trust*

Rusty designated Rita as the trustee and primary beneficiary of the Family Trust. (Will § 6.1.) As such, Rita was entitled to:

> Such amounts of trust income and principal as shall be necessary, when added to funds reasonably available to [Rita] from all other sources known to [her] (including, without limitation, property in the [Marital Trust]), to provide for her health, support and maintenance *in order to maintain her*, to the extent reasonably possible, *in accordance with the standard of living to which* [she was] *accustomed at the time of* [Rusty's] *death*.

(Will § 6.2 (emphasis added).) As to Rita's standard of living, Kathleen testified that Rusty would provide Rita with "[w]hatever [she] wanted, including the sixteen acre property known as Brehon so that she could satisfy her love of horses. (Tr. 3 at 32:10–12, 32:20–22, 33:14–16.) In other words, "she wanted for nothing[;] [w]hatever Rita wanted, Rita got." (Tr. 3 at 35:12–16.)

---

[3] The value in assets funneled into the Family Trust was the maximum that qualified for tax exemption. (Tr. 3 at 120:13–16.) The remaining property compromised the Marital Trust's *corpus*.

[4] Kathleen has owned Brehon since 2005, which is when she purchased from Rita the interests in Brehon, LLC held by the Marital Trust and her mother. (Tr. 3 at 32:13–19, 52:23–25.) Although Kelley and Rita never really got along, the friction that led ultimately to Kelley's litigation against Rita and the Individual Defendants appears to have emerged only after Kelley learned of this transaction in 2007. (Tr. 1 at 167:25–168:3; Tr. 3 at 49:22–50:22.)

4

Whereas Rita was the primary beneficiary of the Family Trust, Rita's descendants, including her children, were permissible beneficiaries up until Rita's death. (Will § 6.2.) Specifically, Rusty's Will provided that Rita had the option, as indicated by the word "may," of distributing to her descendants "such amounts of trust income and principal as shall be necessary, when added to the funds reasonably available to such distributee from all other sources known to [Rita], to provide for the health, support, maintenance and education of each such distributee." (Will § 6.2.) Upon Rita's death, the descendants were to be appointed co-trustees of the Family Trust and the remaining funds in both Trusts were to be combined and then distributed *per stirpes* into four separate support trusts—one for each of Rita's children. (Will §§ 6.3, 7.1, 7.2, 8.1.) While the descendants have assumed their roles as co-trustees and the roughly $3,000 in the Marital Trust's account remaining at the time of Rita's death in 2013 has been transferred into the Family Trust, its *corpus* has yet to be distributed into the Descendant Trusts because of the pending litigation. (Tr. 3 at 85:12–15, 205:23–206:6.)

### 2. The Marital Trust

Rusty also appointed Rita as trustee and sole beneficiary of the Marital Trust. (Will § 4.1.) Under its terms, Rita was entitled to all trust income on a quarterly basis and "amounts of trust principal . . . as are necessary when added to the funds reasonably available to [Rita] from all other sources known to [her] . . . to provide for her health, support and maintenance *in order to maintain her*, to the extent reasonably possible, in *accordance with the standard of living to which* [she was] *accustomed at the time of* [Rusty's] *death*."[5] (Will § 4.2 (emphasis added).) In

---

[5] Kelley testified at trial that her layperson's interpretation of the Will led her to believe that every single distribution Rita made as trustee from either trust to either herself or her descendants violated its terms because Rita did not require any beneficiary to demonstrate a need for the funds—even though Kelley admits that the "[n]umber one priority for my father was to ensure that Rita would be taken care of through her life" through his Will. (Tr. 1 at 43:14–19, 179:1–2, 180:3–11, 180:22; Tr. 2 at 25:12–19, 34:23–25.) According to Kelley, "[Rita] had plenty of money of her own. And if she didn't, she had to go

5

contrast to her authority under the Family Trust's terms, Rita did not have power to make distributions to her descendants from Martial Trust funds. (Will § 4.2.)

### 3. The Trustee's Powers and Duties

Notwithstanding the restriction on Rita's power to distribute Marital Trust funds to her descendants, Rita, as trustee of both Trusts, had broad authority to, *inter alia*, exchange, sell and lease the Trusts' assets;[6] invest assets without concern for generating a return; hold trust property in her name; contract on behalf of the Trust with any other party, including a beneficiary, a trustee, a business controlled by a trustee and a trustee's estate; lend money or property from the Trusts to her beneficiaries;[7] allocate, receipt and charge expenses incurred by the Trusts to income or principal, even if such actions "may be contrary to the terms and provisions of the Texas Trust Code"; and make distributions, if authorized, "without any obligations to make proportion distributions or to distribute to all beneficiaries property having equivalent value." (Will § 10.1.) The Will includes an exculpatory clause that indemnifies and holds a trustee, whether it be Rita or the Individual Defendants, harmless from "any liability" resulting from action or inaction "done in good faith and without gross negligence, including without limitation indemnity for . . . ordinary negligence." (Will § 10.4.) Rita's reporting obligations as trustee were minimal; she was only required to apprise the "primary beneficiary" (i.e., herself) of the

---

to the Marital Trust first. And then, after she had spent those monies, she would have to go to the Family Trust." (Tr. 1 at 78:13–17.) As a result, Kelley believes that Rita repeatedly breached her fiduciary duty because "[s]he did not make distributions based on necessity." (Tr. 1 at 43:14–19.)

[6] Although Rita's power to exchange the Trusts' assets is expansive under the terms of the Will, she was prohibited from disposing of "any trust income or principal for less than a full and adequate consideration in money or monies worth." (Will § 10.6.) What qualifies as "full and adequate" consideration is not explained. In her testimony, Kelley acknowledged that the Will permitted Rita to "exchange her real property for stock within the Family Trust" without the need to be insolvent but ignored the very clear power granted to Rita to make distributions to herself and the Family Trust's permissible beneficiaries beyond exchanging property for in-kind consideration. (Tr. 1 at 57:17–20.)

[7] The Will requires that another person can only borrow principal if "adequate interest and security" is provided but does not specify what amount in interest and security suffices as "adequate." (Will § 10.6.)

6

Trusts' activities on at least an annual basis and to provide an accounting to the Family Trusts' permissive beneficiaries upon request. (Will § 10.2.)

### 4. *Rita's Management of the Trusts*

According to Gary Lane, Rita had three accounts with Prospera Financial Services relevant to managing the Trusts' assets: a personal account from which she would pay expenses, including those generated by the Trusts; a margin account for the Family Trust; and a checking account for the Marital Trust. (Tr. 3 at 67:23–68:4, 71:4–10, 94:18–95:6, 124:15–19.) When Rita made a distribution to herself, she would either transfer the funds from the appropriate Prospera account to her individual account with a journal entry recording the transaction or write a check to herself and deposit it in her individual account at Lubbock National Bank.[8] (Tr. 3 at 70:14–71:2, 124:9–14.) Eventually, in May 2012, Kathleen became an authorized signatory on the Marital Trust so that she could pay Rita's bills when Rita was not in Texas. (Tr. 3 at 55:22–56:10.) Kathleen never wrote checks without Rita authorizing her to do so and never used Marital Trust funds to pay her own expenses. (Tr. 3 at 56:11–18.)

### B. Killybegs, LLC

Killybegs, LLC is a foreign limited liability company organized under the laws of Texas[9] that Rita formed on February 19, 2009. (Pl.'s Ex. 13 at PL-151.) On March 4, 2009, Rita transferred her half-interest and the Family Trust's half-interest in the Kennebunkport home into Killybegs. (Tr. 3 at 217:4–6.) Kelley was not a party to this transaction. According to Kathleen, Rita

---

[8] In its 2011 Judgment, discussed *infra*, the 237th District Court in Lubbock, Texas heard testimony from Rita regarding her methods for managing the Trusts' assets and did not find that her use of her personal account to pay trust expenses constituted a violation of her fiduciary duty. (Tr. 1 at 232:25–237:9; Defs.' Ex. 5.)

[9] Texas is also selected as the governing law in § 10.7 of Killybegs's LLC Company Agreement. (Pl.'s Ex. 13 at PL-165.)

7

transferred the property into Killybegs in order to protect against potential lawsuits from tenants. (Tr. 3 at 217:12–14; Tr. 4 at 101:8–18.)

Killybegs' "Company Agreement" dictates that members are not permitted to convey their interest to anyone other than the descendants of Rita O'Shea and that the Kennebunkport property can only be sold by a majority vote of members' interests. (Pl.'s Ex. 13 at PL-152–PL-153.) In 2012, Rita gifted her personal half-interest in Killybegs to Kathleen, Brian and John. (Tr. 1 at 137:9–11; Pl.'s Ex. 3 at PL-035.) Since then, Brian has served as manager; Kathleen has served as the LLC's secretary and treasurer; and John has been involved solely as a member. (Tr. 3 at 221:13–21.) Kelley first became aware of Killybegs' existence immediately after her mother's death on November 8, 2013, at which point she came into possession of an one-eighth interest in Killybegs as a co-trustee of the Family Trust (Tr. 1 at 31:8–9, 109:11–14, 127:25–128:1, 128:25–129:1.) Killybegs was not formed to generate a profit nor has it in fact generated a profit. (Tr. 3 at 217:15–17, 217:18–20, 218:20–22, 222:9–12.) Instead, the home has been rented to generate revenue to pay the LLC's legal expenses. (Tr. 3 at 171-172.) A majority of members' interests in Killybegs voted to require all family members except Kathleen[10] to pay a $100 a day rental fee and a $100 cleaning fee whenever they stayed at the property. (Defs.' Ex. 18 at DEF-0228.).

## C. The 2009 Texas Lawsuit and the 2011 Judgment

Litigation between Kelley and her family began in 2008 when she brought suit against Rita in the 237th District Court of Lubbock County, Texas. (Tr. 1 at 226:16–18.) Kelley voluntarily dismissed this action without prejudice but then refiled her suit in 2009 ("2009 Texas Lawsuit"), naming Rita in her individual capacity and as trustee of both Trusts and Kathleen as co-

---

[10] The court heard credible testimony that Kathleen was not required to pay the rental fee because of her active involvement in managing the property. (Tr. 3 at 223:25–224:13; Tr. 4 at 102:23–103:9.)

defendants. (Tr. 1 at 227:12–24.) In it, Kelley alleged that Rita had committed fraud, breached her fiduciary duties, and converted trust property and that Kathleen that also converted trust property. (Tr. 1 at 227:25–228:12.) Amongst the allegations, Kelley claimed that Rita violated the terms of the Will by distributing monies from the Trusts to herself as beneficiary without adequately demonstrating that she needed the funds; comingling Trust and personal funds; distributing to her descendants the revenue generated when she sold the Marital Trust's half-interest in the office building and parking lot in Lubbock, Texas; and using Marital Trust funds to purchase a $30,000 horse trailer for Kathleen. *See O'Shea*, 2018 Me. Super. LEXIS 190, at *5 (summarizing claims raised in the 2009 Texas Lawsuit).

The District Court granted summary judgment in favor of Kathleen on the conversion claim and rendered its decision ("2011 Judgment") on the remaining claims against Rita on February 15, 2011 after a bench trial. *Id.* It held, *inter alia*, that Rita had not violated the terms of the Will by making distributions to herself from Marital Trust principal and Family Trust income and principal; Rita complied with the provisions of the Family Trust when she made "gifts" to her descendants from its Trusts funds because they constituted distributions that were permitted under the terms of the Family Trust; the revenue resulting from the sale of the Marital Trust's one-half interest in the office building and parking lot belonged to the Marital Trust; Rita did not have the authority to distribute those proceeds to her descendants; and Rita did not abide by the terms of the Marital Trust when she used its funds to purchase a horse trailer for Kathleen. (Pl.'s Ex. 5 at PL-040–PL-42.)

The District Court ordered Rita to reimburse the Marital Trust for the cost of the trailer ($30,000) and for the Family Trust to hold in constructive trust the net proceeds from Rita's sale of the Marital Trust's one-half interest in the office building and parking lot. (Pl.'s Ex. 5 at PL-

9

041.) The court never directed her to transfer the proceeds from this sale into the Marital Trust.[11]

The court also ordered "each party to bear their own attorney's fees and costs incurred in this matter" but was silent as to whether Rita could use trust funds as a trustee cover the cost of litigation or if she could reimburse herself as a beneficiary for the expense. (Pl.'s Ex. 5 at PL-042.) The District Court's decision was final and disposed of all claims before it, including Kelley's claim that Rita breached her fiduciary duty in her management of the Trusts. (Pl.'s Ex. at PL-042.)

Before the 2011 Judgment was entered, Rita put roughly $60,000 into the Family Trust's Prospera account—depositing $30,000 in cash on January 25, 2011 and transferring in $29,875.34 of brokered assets on January 28, 2011.[12] (Tr. 3 at 129:12–25, 131:21–25; Defs.' Ex. 7-A at DEF-0129.) Then, on February 23, 2011, eight days after the District Court issued its decision, Rita transferred $32,462.35 from the Family Trust account into the Marital Trust account. (Tr. 3 at 132:12–22; Defs.' Ex. 8-A at DEF-0138.)

The entry of this judgment did not end Kelley's litigation in Texas. She appealed the decision to the Court of Appeals for the Seventh District, which affirmed the trial court's judgment. O'Shea, 2012 Tex. App. LEXIS 6494, at *25. After she filed another lawsuit in 2014 seeking, inter alia, a bill of review for the 2011 Judgment, the District Court denied it and the Court of Appeals eventually affirmed the lower court's decision. O'Shea v. O'Shea, No. 07-16-00321-

---

[11] Kelley testified that she believed that Rita needed to "pay back" the Marital Trust for the amount the court ordered to be held in a constructive trust. (Tr. 1 at 28:7–9.) She made a similar demand with pre- and post-judgment interest added on the Estate of Rita O'Shea. (Pl.'s Ex. 14 at PL-169–PL-170.) Kelley's argument that Rita needed to move funds from the Family Trust to the Martial Trust to correct for her accounting error is not supported by evidence on the record. Tellingly, Kelley admitted on cross-examination that Rita's personal liability for reimbursing the trust was limited to the $30,000 and acknowledged that the proceeds were to be held in constructive trust. (Tr. 1 at 244:2–6, 244:17–22.)

[12] Although Kelley does not dispute that these particular transactions occurred, she argues that there is no way to know if they were conducted to satisfy the 2011 Judgment. (Tr. 2 at 6:14–21.)

10

CV, 2018 Tex. App. LEXIS 6530, at *13 (Tex. App. Aug. 17, 2018); *Duncan v. O'Shea*, No. 07-11-0088-CV, 2012 Tex. App. LEXIS 6494, at *25 (Tex. App. Aug. 7, 2012).

### D. Rita's Life Insurance Policies

Rita owns two life insurance policies—a policy with Transamerica with a present value, exclusive of interest, of $100,103 and another with Metlife with a value of $22,742.[13] (Pl.'s Ex. 9 at PL-123; Pl.'s Ex. 10 at 130; Pl.'s Ex. 15 at PL-190, PL-191.) The documents in evidence concerning the policies are limited to a business records affidavit from a claims examiner attesting to Rita's ownership of the Transamerica policy as of May 15, 2012; two changes of beneficiaries forms—one from Metlife and the other from Transamerica—executed on that date indicating Rita O'Shea owned the policies; and an Internal Revenue Service Form 712 for the Transamerica policy with a certifying signature from January 3, 2014 that also lists Rita as the policy's owner. (Pl.'s Ex. 9 at PL-121–123; Pl.'s Ex. 10 at PL-124–PL-130.)

In May 2012, Rita called Michael Gomez, inquiring into how she could remove Kelley as a beneficiary of these policies. (Tr. 3 at 137:16–138:18.) Gomez subsequently procured the change of beneficiary form for both policies for Rita, and, then, on May 15, 2012, he witnessed her sign them and attested to her signature. (Tr. 3 at 138:25–139:5, 140:6–11, 144:7–15, 145:6–146:12, 146:19–147:6; Pl. Ex. 10 at PL-126, PL-130.) Gomez testified credibly that Rita was not under any duress and that it was her voluntary decision to change the beneficiaries. (Tr. 3 at 147:7–17.)

Kelley testified to her belief that Rita did not sign the change of beneficiary forms in front of Michael Gomez in Lubbock, Texas on May 15, 2012 because charges were made on Rita's credit card in Maine on that same date. (Tr. 1 at 147:19–148:18, 151:10; Pl.'s Ex. 11 at PL-132.) But when confronted with two charges—one in Lubbock, Texas and the other in

---

[13] Neither party introduced the original Metlife policy into evidence, but the change of beneficiary form contains Rita's signature as the policy's "owner" as of May 15, 2012. (Pl.'s Ex. 10 at PL-130.)

Kennebunkport, Maine—on Rita's card on May 11, 2012, Kelley acknowledged that it was possible that more than one person possessed cards linked to one of Rita's accounts. (Tr. 1 at 192:15–23; Pl.'s Ex. 11 at PL133.) In fact, John; his daughter, Samantha O'Shea; and Kathleen had credit cards that connected to her accounts. (Tr. 3 at 40:7–20, 41:4–8.)

### E. Actions by Individual Defendants as Co-Trustees

Rita was diagnosed with cancer in May 2013 and died on November 8, 2013, at which point, by operation the Rusty's Will, Kelley, Kathleen, Brian and John become co-trustees of the Trusts. (Tr. 1 at 31:8–9; Tr. 3 at 46:11–14; Will § 8.1.) At the same moment Kathleen and Brian became co-executors of Rita's estate in accordance with to the terms of her will. (Defs.' Ex. 2 at DEF-0015–0016.) After her mother's death, Kelley filed two claims against Rita's estate—one to recover for amounts she believed she is owed under the 2011 Judgment and the other for damages stemming from Rita's alleged breach of her fiduciary duties as trustee of the Trusts. (Pl.'s Ex. 14.) Brian and Kathleen, acting in their capacities as co-executors of Rita's estate, did not respond to either claim, effectively denying them.[14] (Tr. 1 at 39:1–7.)

In October 2014, Kathleen opened a "special account" with a $100,000 wire transfer from the Family Trust's Prospera account after she consulted with counsel for the exclusive purpose of paying expenses incurred by the Trusts, including a portion of the taxes on the real estate in which the Trusts had an interest and expenses related to closing Rita's estate. (Tr. 3 at 211:4–12; Tr. 4 at 29:10–13, 35:11–23; Pl.'s Ex. 7 at PL-063; Defs.' Ex. 25 at DEF-0412.) In addition, the Individual Defendants established a separate account (the "Rita O'Shea Estate Account") for other expenses charged to Rita's estate, which they initially funded through personal

---

[14] Kelley views this litigation as her attempt to adjudicate these claims. (Pl.'s Br. at 2.)

12

contributions and/or their portions of the proceeds from Rita's life insurance policies. (Tr. 3 at 199:5–12, 199:25–200:2; Tr. 4 at 22:14–16, 33:23–34:3, 34:24–35:3.)

In order to make a distribution from the Family Trust Prospera account after Rita's death, Kathleen, Brian and John need to all sign a letter of authorization for the money to be released. (Tr. 3 at 135:24–136:3.) None of the Individual Defendants used funds from the special account to pay for personal expenses. (Tr. 3 at 210:19–211:3. Tr. 4 at 29:3–9.) Kathleen consulted with her counsel prior to making any distributions from the Family Trust. (Tr. 3 at 213:6–10.) Through course of litigation, the roughly $600,000 in the brokerage account connected to the Family Trust fell to roughly $19,000 by the time of trial on account of legal fees, accounting fees and taxes stemming from the Family Trust's one-half interest in the Kennebunkport home. (Tr. 3 at 57:21–58:11.)

### F. Kelley's Claims for Damages

In support of her claim for damages related to the alleged breaches of fiduciary duty by Rita and the Individual Defendants, plaintiff called to the stand Roderick Moe, a certified public and forensic account who has previously testified as an expert in federal court and in state courts in Florida and Georgia. (Tr. 2 at 154:13, 154:25–146:1, 156:16–17.) Moe is not licensed in Maine or Texas and has not previously testified regarding Texas trusts or Maine probate issues. (Tr. 2 at 144:16–145:14.) The court ruled from the bench that Moe was not qualified as an expert to identify whether a particular transaction abided by the Will's terms. (Tr. 2 at 153:22–25.)

As a starting point for his analysis, Moe assumed that all of the transactions he reviewed violated the Will's terms. (Tr. 2 at 146:21–147:10.) In reaching his findings, Moe relied on Kelley's representations to him and the documents she and her husband provided. (Tr. 2 at 190:8–14.) Moe did not investigate Rita's standard of living other than reading her testimony.

(Tr. 2 at 215:11–16.) Moe added interest to the amounts claimed as damages because Kelley instructed him to do so—even though he did not know if any judge authorized the imposition of interest on any of the amounts he calculated. (Tr. 2 at 192:3–9, 217:22–24.)

Moe divided the damages alleged into three claims: (1) damages related to the 2011 Judgment (Tr. 2 at 158:3–6, 171:20–22, 172:18–20); (2) the amount in transactions between October 19, 2009 and Rita's death in excess of the income generated by either the Martial or Family Trust (Tr. 2 at 174:11–12, 174:20–24); and (3) the sum of all transactions after Rita passed in November 8, 2013 through to December 31, 2018 from assets held in the Family Trust exclusive of any legal fees related to the 2011 Judgment. (Tr. 2 at 179:15–19, 180:8–16, 180:24–25). Through his analysis, Moe determined that $162,937 belonged to the Marital Trust on account of Rita selling the office building for $240,332 and the parking lot for $85,542 in 2005 and 2007 respectively in which she and the Marital Trust each had a half interest.[15] (Tr. 2 at 169:14–16, 170:1–3, 170:9–14, 171:8–12; Pl.'s Ex. 15 at PL-192.) With interest, Moe valued "Claim 1" at $455,950. (Pl.'s Ex. 15 at PL-204.) As to "Claim 2," Moe calculated, with interest, that Rita took distributions from the Trusts in excess of income equal to $951,463.[16] (Tr. 2 at 178:25–179:1; Pl.'s Ex. 15 at PL-216.) The amount in damages for "Claim 3" that Kelley seeks with interest is $684,559, for a total claim for damages of $2,091,973. (Tr. 2 at 183:2–5, 183:19–23, 183:17–23; Pl.'s Ex. 15 at PL-230.)

## II.    Discussion

---

[15] This is the exact amount held in constructive trust in the Family Trust as a result of the 2011 Judgment. (Pl.'s Ex. 5 at PL-041.)

[16] Although Moe initially calculated "Claim 2" to be for $955,865, Moe testified that this figure was off by $4,402 because he included a distribution to Rita that occurred prior to October 19, 2009. (Tr. 2 at 173:20–174:2; Pl.'s Ex. 15 at PL-216, PL-217.) Rather than adjust the total for all three claims, which Moe did at trial, the $4,402 has been deducted directly from the alleged damages under "Claim 2." (Tr. 2 at 183:17–18.)

Fundamentally, resolution of most of the claims in this case depends on whether this court adopts Kelley's interpretation of Rusty's Will as authorizing distributions from the Trusts under a very limited set of circumstances or the reading advocated by the Individual Defendants, which provided Rita and now provides the Individual Defendants as co-trustees a high degree of latitude to distribute funds even absent a showing of necessity.[17] Because this court finds that the defendants' interpretation accords with the unambiguous and plain language of Rusty's Will, the Individual Defendants, in the various capacities in which they are subject to suit, are not liable for the damages alleged by plaintiff. Each of counts articulated in Kelley's complaints and the additional claims she asserted at trial will be discussed in turn.

## A. Breach of Fiduciary Duty to the Trusts by Rita and the Individual Defendants (Count I)

Under Maine law, the jurisdiction either named in a trust or will or with the most significant relationship to the testamentary instrument govern the meaning and effect of its terms. 18-B M.R.S. §§ 107–108. The express terms of Rusty's Will identify that jurisdiction as Texas. (Will § 10.1.) In addition, Texas is the sovereign with the most significant contacts to the dispute: Rusty published his will in 1996 while living in Texas (Will art. I, IV, VI); his will and estate were probated in Texas (Will art. 1); and the trusts, since their inception, have been administered in Texas (Tr. 4 at 97:2–15). Therefore, the law of Texas—not Maine—governs the meaning and effect of Rusty's Will and the trusts established thereby and therein.

To establish that the Individual Defendants violated Texas law, Kelley must first prove by a preponderance of the evidence that (1) a valid trust existed at the time of the alleged breach; (2) a fiduciary relationship between Kelley and Rita and/or the Individual Defendants existed at that time; and (3) Rita and/or the Individual Defendants breached the duty owed to Kelley. (Order on

---

[17] The claims related to Killybegs are conceptually distinct and will be addressed separately.

Pl.'s Mot. Lim 7.) If Kelley can satisfy these three requirements, then the burden of persuasion shifts to defendants, who must show by a preponderance of the evidence that their actions were justified and did not violate the fiduciary duties that they or Rita owed to Kelley. (*Id.*)

### 1. *Kathleen and Brian's Liability as Co-Executors of Rita's Estate*

Kelley's allegations regarding breaches of fiduciary owed to the Trusts are best understood as relying on three distinct theories for holding the Individual Defendants liable. The first is Kathleen and Brian are liable as co-executors of Rita's estate for Rita's alleged breaches when she served as trustee between October 19, 2009 and November 8, 2013.[18] These allegations track Kelley's second claim against Rita's estate. (Pl.'s Ex. 14 at PL-175–PL-176; *see* Pl.'s Br. at 26.) For these allegations, Kathleen and Brian stand in Rita's shoes, and the degree to which they are accountable will depend on the extent of Rita's liability, including whether the Will's exculpatory clause protects Rita's actions.[19]

Kelley argues, in essence, that Kathleen and Brian are liable as co-executors of Rita's estate for Rita's breach of fiduciary when she (a) made distributions after October 19, 2009 to herself as the sole beneficiary of the Marital Trust and the primary beneficiary of the Family in contravention of the Will's terms; (b) distributed Family Trust funds to her descendants without requiring them to demonstrate a financial need; (c) loaned funds to her descendants without requiring adequate security; (d) comingled trust and personal assets; (e) received compensation for managing Killybegs; (e) transferred the Family Trust's interest in the Kennebunkport home into Killybegs without protecting the permissible beneficiaries' rights; (f) changed the

---

[18] Claims related to Rita's actions prior to October 19, 2009 are barred by *res judicata. O'Shea*, 2018 Me. Super. LEXIS 190, at *22.

[19] Contrary to defendants' argument, Kathleen and Brian cannot find safe harbor for these particular claims in § 10.3 of Rusty's Will because it only protects successor trustees from liability for a predecessor's breach—not co-executors of the trustee's estate. (Defs.' Br. at 52.)

beneficiaries on life insurance policies that belonged to the Trusts; and (h) did satisfy the accounting provisions in Rusty's Will.[20]

### a. Rita's Distributions from the Trusts to Herself

This court does not find merit in Kelley's argument that the terms of Rusty's Will prevented her from distributing funds to herself as the sole and primary beneficiary of the Marital and Family Trusts respectively because the Will's unambiguous language authorizes her to do so. Rusty's Will clearly authorizes Rita to distribute either income or principal from either of the Trusts to herself in her dual role as trustee and beneficiary without requiring her to demonstrate to herself that she had a financial need for such distributions because the terms of both Trusts include identical language authorizing her to make distributions "in order to maintain her, to the extent reasonably possible, in accordance with the standard of living to which [she was] accustomed at the time of [Rusty's] death." (Will §§ 4.2, 6.2.) Consequently, Rita was entitled to make distributions to herself as a beneficiary of both Trusts without demonstrating a financial need if she did so to maintain her standard of living, which was affluent.[21]

Kelley has failed to establish that Rita's distributions were in excess of an amount sufficient for Rita to preserve the quality of life she was accustomed to when married to Rusty. Instead, Kathleen testified credibly that that Rusty provided for Rita to such a degree that [w]hatever Rita wanted, Rita got" and that Rita maintained the same lifestyle that she had while [Rusty] was alive" with any increases in spending after the 2011 being attributable to Rita's medical and legal

---

[20] Kelley testified to her belief that Rita also breached a fiduciary duty by receiving compensation for managing Killybegs. (Tr. 1 at 135:13–15.) Kelley does not advance this argument in either her post-trial brief or her reply brief, nor does she cite to a provision in the Will that would prevent Rita from being remunerated for managing an LLC with a one-half interest property belonging to the Family Trust. Consequently, the court will not reach this undeveloped claim.

[21] This conclusion echoes the Court's decision in its pretrial order on pending motions. *O'Shea v. O'Shea*, No. CV-14-157, 2018 Me. Super. LEXIS 190, at *27 (Apr. 4, 2018).

17

expenses and to updating her home in Lubbock to accommodate her worsening physical condition. (Tr. 3 at 35:12–16, 162:7–14, 162:25–163:2, 165:1–16.) In the end, Kelley reads a means test into Rusty's Will that simply does not exist. Therefore, Kathleen and Brian are not liable as co-executors of her estate for any such distributions between October 19, 2009 and her death on November 8, 2013.

Even if this were not the case, the Will's exculpatory clause would protect her actions because Kelley did not offer any evidence that Rita acted in either bad faith or with gross negligence. The pertinent part of Rusty's Will reads as follows:

> "Any Executor or Trustee shall be indemnified and saved harmless from any liability for any action such Executor or Trustee may take, or for the failure . . . to take any action, if done in good faith and without gross negligence, including without limitation indemnity for the ordinary negligence of such Executor or Trustee.

(Will § 10.4.) Under Texas law, such clauses are valid if they protect actions in good faith and without gross negligence. *Messner v. Boon*, 466 S.W.3d 191, 210 (Tex. App. 2015); *See* Tex. Prop. Code Ann. § 113.051 ("The trustee shall administer the trust in good faith according to its terms and this subtitle.") Kelley argues unpersuasively that this exculpatory clause is invalid under Texas law because it relieves a trustee of liability to the extent it is incurred for breaches committed in bad faith, intentionally, or with reckless indifference to a beneficiary's interest or for liability stemming from any profit derived from the trustee's breach. Tex. Prop. Code Ann. § 114.007(a). As is obvious by its plain language, § 10.4 does not absolve a trustee from liability for actions taken with bad faith, intent, or a reckless disregard for a beneficiary's interest; nor does this section protect a trustee for claims related to profits derived from a breach of fiduciary duty. Therefore, even if Kelley established that Rita breached her fiduciary duty by making

18

distributions to herself as a beneficiary of the Trusts, Kathleen and Brain still would not be liable because of the Will's exculpatory clause.[22]

*b. Rita's Distributions to her Descendants*

The same principles and reasoning apply to shield Kathleen and Brian from liability in their roles as co-executors for any distributions Rita made to her descendants from the Family Trust after entry of the 2011 Judgment. As trustee, Rita could exercise her powers to "distribute to [Rusty's] descendants such amounts of [Family] [T]rust income and principal as shall be necessary, when added to the funds reasonably available to each such distributee from all other sources known to [Rita], to provide for the health, support, maintenance and education of each such distributee." (Will § 6.2.) This section of the Will is unambiguous in providing Rita with the discretion to decide, based on the information available to her as trustee, that a distribution would help provide for her descendants' wellbeing. Nowhere is there a requirement that a descendant demonstrate a sufficient financial need before Rita could exercise this power. Since no such limitation on Rita's power exists under the Will, Kelley cannot carry her burden of proof by simply pointing to evidence that distributions to Rita's descendants, including Kelley, were not absolutely necessary. As such, Rita did not breach a fiduciary duty owed to Kelley for making distributions that are clearly in accordance with the Will's terms.

*c. Rita's Loans*

Another claim Kelley makes is that Rita breached her fiduciary duty in loaning trust funds in contravention of the Will's terms. (Pl.'s Br. at 28.) While Kelley admits that Rita was authorized

---

[22] Although discussed only in reference to Kelley's claim that Rita breached her fiduciary duty by making distributions to herself as a beneficiary of the Trusts, this exculpatory clause is effective to protect Kathleen and Brian from liability for all of breaches of fiduciary duty that Kelley alleges Rita committed. Kelley never introduced evidence that Rita acted in bad faith or with gross negligence between October 19, 2009 and November 8, 2013.

19

to make loans from the Trusts, she believed that a beach occurred because Rita did not require the other party to the transaction to provide security and interest in exchange. (Tr. 1 at 43:21–44:13.) The limitations on a trustee's power to lend trust assets depends on the interplay between § 10.1(p), which authorizes a trustee "[t]o lend cash or property any beneficiary or any other person . . . upon such terms and conditions as may be appropriate," and a qualification to a trustee's powers articulated in § 10.6:

> Notwithstanding the provisions of section 10.1, none of the powers enumerated therein or any other power accorded to my Executor or my Trustee under Texas law or any other provisions of this Will shall be construed to . . . enable my Executor, my Trustee, or any other person or persons to borrow principal from my estate or any trust, directly or indirectly, without adequate interest and security.

(Will §§ 10.1(p), 10.6.) What constitutes "adequate interest and security" is not defined or explained in the Will. Regardless of this apparent ambiguity, there are three fundamental problems with Kelley's argument. First, there is not credible evidence in the record—except as to a single loan to Brian[23]—that Rita did not collect interest or require security in exchange for a loan. Instead, she argues that the absence of records in itself is proof of impropriety: "there are no trust records of loans at all[,] nor are there any records of any payments on the loans. The money is simply gone without a trace." (Pl.'s Br. at 28–29.) Her general appeal to *argumentum ad ignorantiam* is misplaced because of the burden of proof in this case; in order for the Individual Defendants to be required to prove by a preponderance of the evidence that a breach did not occur, Kelley has to first carry her burden of persuasion, and she cannot rely solely on the

---

[23] Brian acknowledged that he did not pay interest or provide security for the loan he received from Rita for $50,000 on September 5, 2012. (Tr. 4 at 87:1–3, 88:17–22.) Kelley has not provided evidence that this was a loan of trust principal, which is a prerequisite to trigger the restrictions in § 10.6. She concedes in her brief that the only record of this transaction is a wire transfer instruction, which does not indicate the purpose of the transfer or whether the funds came from the Family Trust's income or principal. (Pl.'s Br. at 9; Pl.'s Ex. 7 at PL-062.) Therefore, she has not carried her initial burden of proof as to a breach of fiduciary duty by Rita for making this loan without requiring interest and security as to Rita's loan to Brian.

20

absence of evidence as proof necessary to advance her claim.[24] Second, Kelley has not offered evidence to establish by a preponderance that any of these loans concerned principal from either trust, which means that Rita's action may not have even triggered the interest and security requirement in § 10.6. Third, she has not provided evidence that even if the distributions qualify as loans, the interest and security was not "adequate," particularly in light of the fact that many of those alleged loans were to Rita's children. Therefore, Kelley has not carried her initial burden in showing that Rita breached a fiduciary duty owed to Kelley by loaning trust assets, which means her claim on this ground fails.

### d. Rita's Comingling of Trust Assets

Similarly, Kelley has not carried her initial burden in showing that Rita breached her fiduciary duty by comingling personal and trust funds. To prevail, Kelley would have needed to prove that the Will forbids commingling (i.e., Rita had a duty to Kelley not to comingle assets) and that the transfer of funds from one of the Trusts' Prospera accounts to her personal account constituted comingling (i.e., Rita breached her duty to Kelley). Assuming for a moment that Rita did hold trust and personal assets in the same account, her actions would not violate the Will's terms because she was authorized to register and carry trust property in her name in her role as trustee. (Will § 10.1(e).) Regardless, the record demonstrates what Kelley classifies as comingling—the transfer of trust funds from one of the Trusts' Prospera accounts into Rita's personal Prospera account—was, in fact, Rita making distributions to herself as a beneficiary. (Tr. 3 at 70:14–71:2, 124:9–14; Defs.' Ex. 5 at DEF-0059–DEF-0061.) Needless to say, the funds cease to belong to the trust once they have been distributed to a beneficiary, which means

---

[24] The court understands the frustrating position in which this lack of records places plaintiff to prove her claim that Rita breached her fiduciary duties by loaning funds in contravention of § 10.6, but the absence of these records does not prove that Rita did not abide by the Will if and when making loans from the Trusts' principal.

21

that Kelley did not establish that Rita ever comingled trust and personal assets and that Brian and Kathleen are not liable on this basis.

### e. *Rita's Conveyance of the Family Trust's Interest in the Kennebunkport Home into Killybegs*

Another ground on which Kelley advances her claim that Rita breached her fiduciary duty concerns Rita's conveyance of the half-interest in the Kennebunkport home belonging to the Family Trust into Killybegs, which Kelley alleges compromised without compensation the rights she now possesses in the Kennebunkport property as a co-trustee of the Family Trust. (Pl.'s Br. at 29.) The court finds it difficult to differentiate this breach of fiduciary duty claim from Kelley's breach of contract claim. To the extent that it *is* qualitatively different, it is barred by *res judicata* because the conveyance occurred in March 2009, which is prior to the commencement of Kelley's litigation against Rita and Kathleen in Texas District Court. Contrary to Kelley's assertion in her reply brief that this court decided that *res judicata* did not bar claims related to Killybegs, the court did not resolve the matter but instead held the issue in abeyance until the conclusion of the trial.[25] (Tr. 1 at 7:13–17; *see* Pl.'s Reply. Br. at 15.)

With all of the evidence now before it, the court cannot conceive of a reason to treat claims related to Killybegs that arose prior to October 19, 2009 any differently than the claims Kelley puts forward stemming from distributions by Rita as trustee before that date. *See O'Shea*, 2018 Me. Super. LEXIS 190, at **19–22 (outlining the court's rationale for barring claims related to distributions executed before Kelley sued Rita and Kathleen in October 2009). Kelley had an opportunity to raise this claim in Texas District Court, and its 2011 Judgment was final,

---

[25] Counsel for plaintiff appeared to confuse this court's decision that Maine's statute of limitations would govern claims related to Killybegs with a ruling on the applicability of *res judicata.* (Tr. 1 at 5:22–3.) Although both doctrines may bar a particular claim, the court's decision on one did not preclude it from relying on the other to dispose of one or more of Kelley's arguments.

22

disposing of all of Kelley's claims that Rita breached her fiduciary duty prior to October 2009. (Pl.'s Ex. at PL-042.) This court sees no reason to not recognize the binding nature of its sister court's decision.

### f. Rita's Life Insurance Policies

Kelley also argues that Rita breached her fiduciary duty by changing the beneficiaries on the Transamerica and Metlife policies, but this claim is fatally flawed because it presupposed a fact not in evidence—viz., that the policies belonged to the Trusts. For the policies to have flowed into the Trusts at Rusty's death, they would have needed to qualify as "community property"— not Rita's "separate property." Tex. Fam. Code Ann. § 3.001 (defining "separate property" as, *inter alia*, "property owned or claimed by the spouse before marriage" and "property acquired by a spouse during marriage by gift, devise or descent"); Tex. Fam. Code Ann. § 3.002 (defining "community property" as "property, other than separate property, acquired by either spouse during marriage"). The facts before the court regarding the two policies are scant; the court has received no evidence indicating when the policies were purchased, which may have been dispositive given that property acquired during marriage is presumed to be communal. Tex. Fam. Code § 3.003. Because Kelley has not established that the policies belonged to the Trusts vis-à-vis their status as community property, her breach of fiduciary duty claim against Kathleen and Brian on this ground necessarily fails.

It is important to note that the court is not necessarily convinced that the Will prevented Rita from changing the beneficiaries on the life insurance policies even if it found that the policies belonged to the Trusts, with the outcome dependent on whether they belonged to the Marital Trust or Family Trust. As trustee, Rita had broad authority to distribute trust income and principal from the Family Trust to its permissible beneficiaries, and she was under no obligation

23

to dispose of trust property equally between them. (Will §§ 6.2, 10.1(j).) If the policies did, in fact, belong to the Family Trust, she certainly possessed the power as trustee to change the policies' beneficiaries. If, instead, Rusty's one-half interest in the policies belonged to the Martial Trust, then Rita likely would not have been authorized as trustee to change the beneficiaries. But Kelley has not established that *any* interest in the policies belonged to *either* of the Trusts, which means that this court cannot state definitively whether she would have succeeded on this claim if she had proven that the policies belonged to the martial estate.

g. *Rita's Accounting of Trust Assets*

The last ground on which Kelley's claim that Rita breached her fiduciary duty stands is that Rita violated the Will's terms by not maintaining adequate records. Simply put, Rita was not required either by record-keeping provisions enshrined in § 10.2 of Rusty's Will or Texas law to account to all of the Trusts' beneficiaries for her actions as trustee. Tex. Prop. Code Ann. § 113.151; *See Corpus Christi Bank & Tr. v. Roberts*, 587 S.W.2d 173, 181 (Tex. App. 1979), *aff'd*, 597 S.W.2d 752 (Tex. 1980) (finding that the Texas Trust Act did not impose a precise accounting requirement when none existed by the trust's terms). Instead, Rita was only obligated to provide a written statement to the primary beneficiary (i.e., herself) and to produce for inspection records in response to a written demand by a permissible beneficiary. (Will § 10.2.) Kelley has not offered evidence that she made such a demand during Rita's tenure as trustee, which means that neither Rita, or, by extension, Kathleen and Brian as co-trustees of her estate are not liable for a failure to adequately account for the Trusts' assets.

### 2. *The Individual Defendants' Liability as Co-Trustees for Profiting from Rita's Breach of Fiduciary Duties*

The second theory on which Kelley relies is that the Individual Defendants are collectively liable as co-trustees of the Trusts for profiting from Rita's alleged breach of her fiduciary duty.

24

(Kelley's Br. at 26.) The defendants argue that they cannot be held liable as co-trustees for Rita's actions because § 10.3 of Rusty's Will states that successor trustees are "relieved of any duty to examine the acts of any prior fiduciary" and "responsible only for those assets which are actually delivered" to them. (Defs.' Br. at 52.) Kelley counters by positing that as a matter of law this clause is invalid because it relieves trustees of liability for breaches of fiduciary duty committed in bad faith, intentionally, or with reckless indifference to a beneficiary's interest or liability stemming from any profit derived from the trustee's breach. Tex. Prop. Code Ann. § 114.007(a). This court is not persuaded that § 10.3 violates § 114.007(a) of the Texas Trust Code given the clause's unambiguous language. It does not, in either intent or effect, absolve trustees of liability for actions committed by their predecessor in bad faith, intentionally or with reckless indifference. Since it is not invalid as matter of law, Kelley would need to show that Rita, in fact, acted in bad faith, intentionally or with reckless indifference in order to pierce the protection offered by § 10.3. She has failed to do so. Kelley has not offered any evidence that might prove that Rita took actions during her life, as the primary beneficiary of both Trusts and their trustee, other than to provide for herself and her descendants in accordance with the terms of Rusty's Will. Absent such a showing, the defendants are shielded from liability for allegedly profiting from Rita's impropriety.

Even assuming, *arguendo*, that Kelley had carried her initial burden of persuasion in demonstrating that the Individual Defendants' profiting from Rita's breach constituted a breach of fiduciary duty in itself, the Individual Defendants would still be protected by the Texas Trust Code. Tex. Prop. Code Ann. § 114.002 (limiting liability of a successor trustee to situations in which they "know[ ] or should know of a situation constituting a breach of trust committed by the predecessors" *and* the successor trustees "improperly permit[ ] it to continue; fail[ ] to make a

25

reasonable effort to compel the predecessor trustee to deliver the trust property; or fail[ ] to make a reasonable effort to compel a redress of a breach of trust committed by the predecessor trustee"). The court heard credible testimony from Kathleen did not know and had no reason to know how Rita managed the Trusts, and Kelley did not provide evidence that either John or Brian had any knowledge of how their mother managed the Trusts prior to assuming their roles as co-trustees. (Tr. 3 at 52:2–6.)

### 3. *The Individual Defendants' Liability as Co-Trustees for Breaching their Fiduciary Duties*

The third and final theory of liability put forward by Kelley is that the Individual Defendants violated their fiduciary duties when serving as co-trustees by comingling trust funds, not requiring a beneficiary to demonstrate a financial need prior to any distributions of assets from the Family Trust, and using the trust's funds to pay for expenses associated with closing Rita's estate. (Kelley's Br. at 24–25.) The facts and the Will's unambiguous language do not support any of these claims. The court heard credible testimony that the Individual Defendants established a separate "special account" that has been used exclusively for paying the Trusts' expenses and that none of the Individual Defendants have used funds from this account to pay for personal expenses.[26] (Tr. 3 at 210:19–211:12; Tr. 4 at 29:3–13.) The Individual Defendants' use and maintenance of this special account defeats Kelley's claim that they comingled the Trusts' assets. Nor does this court find persuasive Kelley's argument that the Individual Defendants have breached their fiduciary duties by not requiring beneficiaries to demonstrate a financial need prior to making a distribution for the identical reasons, articulated above,

---

[26] These expenses include taxes on the home in Kennebunkport and other costs associated with maintain the property because the Family Trust has a one-half interest in it.

26

regarding Rita's authority to make distributions without the beneficiary demonstrating that they absolutely needed the funds.

Kelley's argument that the Individual Defendants could not use the Family Trust to pay expenses incurred on account of Rita's death also contradicts the plain meaning of the Will's unambiguous language. Kelley explained at trial that she believes that the only permissible use of any funds left in the trusts once Rita died was to establish the four descendant trusts as outlined in Article VII. (Tr. 1 at 123:10–11.) The problem with this position is that § 4.3 explicitly requires, as indicated by the word "shall," the co-trustees to use trust assets to pay for any taxes incurred if the inclusion of the trusts' principal in the calculation of Rita's gross estate unless she provided to the contrary in her will:

> Upon the death of my wife, unless my wife provides to the contrary by specific reference to this trust in her Will, my Trustee *shall* pay for the principal of the trust administered pursuant to this Article the difference between all taxes which must be paid by reason of my wife's death and those taxes which would be payable by reason of her death had such principal not been includable in her gross estate for the purpose of calculating such taxes.

(Will § 4.3 (emphasis added).) In addition, the Will authorizes the co-trustees to exercise their "absolute and uncontrolled discretion" to pay from the trusts' principal "all or any part of [Rita's] funeral expenses, claims which [are] legally enforceable against [her] estate (including estate, inheritance, transfer and success taxes) and reasonable expenses of administration of [Rita's] estate" with the limitation that the co-trustees cannot "make any such payments that are not in the best interests of my descendants." (Will § 4.3.) As evidenced by this language, Kelley's proposition that the Will only allows for the creation of the descendants' trusts after Rita's death is undermined by the its unambiguous terms.

In the alternative, Kelley argues that even if the Will permits the use of principal to pay for expenses associated with Rita's estate in the abstract, the restriction regarding the use of those

27

assets in a way that is not in the descendants' best interests bars the Individual Defendants from drawing from trust funds because Rita disinherited Kelley. As a result, the court is required to decide whether the use of the word "descendants" should be interpreted to mean that trust funds are only available to pay Rita's expenses if doing so is in the best interest of all descendants or just a majority of descendants. By its unambiguous language, the instrument imposes a limitation on the use of principal to pay expenses associated with Rita's death if not in the best interests of the descendants as a class, not if the distributions offend a single descendant's interests. The Will does not provide a single descendant veto power over the trustee's exercise of its discretion.[27]

Because the trustees' power to pay for expenses incurred at the end of Rita's life is discretionary—as indicated by the word "may" in § 4.3—this court can only intervene to override their decision if it constituted an abuse of discretion. *In re XTO Energy Inc.*, 471 S.W.3d 126, 131 (Tex. App. 2015) ("[W]hen a trustee is given discretion with respect to the exercise of a power, a court may not interfere except to prevent an abuse of discretion."); *Di Portanova v. Monroe*, 229 S.W.3d 324, 330 (Tex. App. 2006) (finding that "the [t]rustees, not the court, are given the power to determine the best interest of the beneficiary" when the trust is discretionary). The co-trustees acted within the bounds of the authority provided to them by using the principal to pay for the exact types of expenses described in the Will, which means that they did not abuse their discretionary powers as co-trustees; therefore, the Individual Defendants did not breach a fiduciary duty to Kelley by dispensing principal to pay for the expenses incurred by Rita's passing.

---

[27] The inclusion of the word "any" before "my descendants" might have aligned the will's language with Kelley's interpretation. Absent such verbiage, Kelley's argument does not accord with the plain meaning of the will's terms.

It is worth noting that even if Kelley had carried her initial burden in showing that any of the Individual Defendants' actions constitute a breach of fiduciary duty, she would also need to pierce the protections provided by the Will's exculpatory clause (§ 10.4) by either establishing, as a matter of law, that this clause is invalid pursuant to § 114.007(a) of the Texas Trust Code (an argument this court has already addressed) or by proving that the Individual Defendants acted in bad faith or with gross negligence. Although Kelley states in her post-trial brief that the Individual Defendants breached the trust "in bad faith and intentionally" and "with reckless indifference to the interest to the interests of the beneficiaries," she does not adduce to any evidence to support her contention that the exculpatory clause should not apply. (Pl.'s Br. at 26.) Bare recitations of the statutory language without more does not pierce the protections offered by the exculpatory clause in Rusty's Will, especially in light of the evidence produced by the defendants at trial that they consulted with counsel prior to making any distributions. (Tr. 3 at 213:6–10.)

## B. Breach of Contract by Brian, Kathleen and Killybegs, LLC in Purchase of Kennebunkport Home (Count II)

Beyond her claims against the Individual Defendants for breach of fiduciary duties stemming from the Trusts, Kelley also seeks relief for an alleged breach of contract by Killybegs, Brian and Kathleen related to the conveyance of the Family Trust's interest in the Kennebunkport home into Killybegs in March 2009.

First, Kelley cannot recover for breach of contract because her claim is barred by *res judicata*. Claim preclusion bars relitigation of a cause of action if (1) the same parties or their privies are involved in both actions; (2) the prior court entered a valid final judgment; and (3) the matters presented for decision in the subsequent action were litigated in the prior action or might have been litigated in that proceeding. *Macomber v. Macquinn-Tweedie*, 2003 ME 121, ¶ 22, 834

29

A.2d 131. To determine whether an action is barred by claim preclusion, the court applies a transaction test that examines "the aggregate of connected operative facts that can be handled together conveniently for purposes of trial to determine if they were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong." *Norton v. Town of Long Island*, 2005 ME 109, ¶ 18, 883 A.2d 889 (quotation marks omitted). A claim is precluded if it satisfies this test even if the second action "relies on a legal theory not advanced in the first case, seeks different relief than that sought in the first case, or involves evidence different from the evidence relevant to the first case." *Id.* (quotation marks omitted). Here, the same parties or their privies are involved in this action and the lawsuit Kelley filed in Texas in 2009; the Texas District Court entered a valid judgment that was upheld on appeal; the breach of contract claim arises out of the same operative facts as those that form the basis of Kelley's 2009 lawsuit (i.e., that Rita improperly transferred assets out of the Trusts); Kelley seeks redress for essentially the same wrong; and Kelley could have litigated her claim regarding the transfer of the Kennebunkport home into Killybegs in the prior proceeding because it occurred roughly six months before she filed her lawsuit in October 2009 and she was put on notice of the transfer through an interrogatory answer as of four months prior to the trial starting. (Pl.'s Ex. 4 at PL-036–038; Defs.' Ex. 4 at DEF-0033). Therefore, the court finds that her breach of contract claim is barred by the doctrine of res judicata.

Second, even if this court were to decide Kelley's breach of contract claim on its merits, she cannot recover because she has proven that a contract existed or that a breach occurred. Under Maine law, "a contract exists when the parties mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite." *McClare v. Rocha*, 2014 ME 4, ¶ 16, 86 A.3d 22 (internal quotations

marks omitted). When asked to articulate the basis for her breach of contract claim, Kelley stated that the defendants' liability stems from a nebulous "agreement" through which Rita, as trustee, conveyed the Kennebunkport resident into Killybegs in exchange for Killybegs promising to abide by the LLC agreement. (Tr. 2 at 110:7–17.) But Kelley has not furnished the court with the terms of *any* agreement—even one that is vague and indefinite—that might be interpreted to have governed the transaction between Rita as trustee of the Family Trust and Killybegs for the Kennebunkport residence. Kelley has also failed to offer evidence that either the Individual Defendants or Killybegs breached a material contractual term or that she suffered damages as a result. *See Tobin v. Barter*, 2014 ME 51, ¶ 10, 89 A.3d 1088. It is elementary that without a contract, there can be no breach. As to damages, Kelley acknowledged at trial that her voting power and control over the property's management as a member of Killybegs is identical to any powers she would possess as co-trustee if it belonged entirely to the Family Trust because either way she would only have a one-eighth interest. (Tr. 2 at 85:18–86:2.) Since Kelley has not provided evidence to establish that Brian, Kathleen and Killybegs entered into a contract; that any of them breached a contract; or that Kelley has suffered any damages, she cannot recover on her breach of contract claim.

## C. Breach of Fiduciary Duty by Individual Defendants as Members of Killybegs (Count III)

Kelley's argument that she can recover for the Individual Defendants' alleged breach the fiduciary duties they owe to Kelley[28] in regards to Killybegs suffers from similar deficiencies. Under the Maine Limited Liability Company Act, "[t]he laws of the State . . . under which a

---

[28] To date, Kelley's interest in Killybegs is as a co-trustee of the Family Trust, which itself is a member of the LLC. Because Kelley has not put forward evidence that she can recover even if she was a member of Killybegs, the applicable law is discussed in terms of the duties owed by Kathleen and Brian to Kelley as if Kelley did, in fact, qualify as a member.

foreign limited liability company is formed govern its formation and internal affairs and the liability and authority of its members and agents," which means that the degree to which the Individual Defendants are liable for breaching their fiduciary duties hinges on the law of Texas—not Maine.[29] 31 M.R.S. § 1502(11)(B) (defining a "foreign limited liability company" as, *inter alia*, a LLC "[o]rganized under the laws of a state other than the laws of this State"); 31 M.R.S. § 1621(1).

Subject to exceptions that do not apply in this case, an LLC's company agreement governs its internal affairs and the relations amongst its member(s) and manager(s). Tex. Bus. Orgs. Code § 101.052. It may expand or restrict any duties, including fiduciary duties, owed by any member or manager to the LLC itself or to its members or managers. Tex. Bus. Orgs. Code § 101.401. But it may not eliminate liability under applicable law for (1) a breach of a person's duty of loyalty, if any exists; (2) an act or omission in bad faith that constitutes a breach of a duty owed or involves either intentional misconduct or a knowing violation of the law; (3) a transaction from which the person receives an improper benefit, even if the benefit resulted from an action taken in accordance with the person's duties; or (4) an act or omission for which the person is expressly liable under applicable law. Tex. Bus. Orgs. Code § 7.001(c)–(d).

While the Texas statute acknowledges that a fiduciary duty can exist between members and/or managers, it "is silent on whether such a duty is imposed" on members in particular, which is in sharp contrast to Maine law. *Compare Houle v. Casillas*, __ S.W.3d __ (Tex. App. 2019) ("[T]he Texas Supreme Court has recognized that in certain formal relationships, including partnerships, a fiduciary duty arises as a matter of law . . . . It is less clear, however,

---

[29] Both parties submitted briefs that couched their arguments in the language of the Maine Limited Liability Company Act. (Pl.'s Br. at 31; Defs.' Br. at 54–57.) Since the Act explicitly states that the law of the state of organization applies, this court is not swayed that it should instead decide whether the Individual Defendants breached a fiduciary duty in accordance with Maine common or statutory law.

32

whether members of an LLC owe each other a fiduciary duty."); *to Cianchette v. Cianchette*,

2019 ME 87, ¶¶ 34–35, 209 A.3d 745 (holding that the Maine Limited Liability Act does not

impose a fiduciary duty on an LLC's members when the company agreement is silent on the

matter). It is also not entirely clear if Texas law imposes, as a default, a fiduciary duty on even a

LLC's manager(s) absent express language in a company agreement:

> [A]s was true with its predecessor, the Texas Limited Liability Company Act,
> Chapter 101 of the Texas Business Organizations Code does not directly address
> the duties owed by LLC managers and members . . . . Thus, though Texas statute
> governing limited liability companies implies that certain duties may be owed, it
> does not define any such duties, but rather allows the contracting parties to
> specify the breadth of those duties in the company agreement.

*In re Lau*, No. 11-40283, 2013 Bankr. LEXIS 4587, at *74 (Bankr. E.D. Tex. 2013).

Consequently, the degree to which the Individual Defendants owe Kelley a fiduciary duty as a

members of Killybegs depends on the duty or duties set forth in the Company Agreement, so

long as the lack thereof does not violate the limitations imposed by Tex. Bus. Orgs. Code §

7.001(c)–(d).

To begin, Kelley has not introduced evidence a trial or cited to either relevant Texas law or

language in the Killybegs Company Agreement that John, as a non-managing member, had or

has a fiduciary duty to Kelley, which means that her claim survives only as it relates to Kathleen

and Brian.[30] Kelley's claim is further limited, to the extent the court recognizes it in regards to its

interpretation of the Company Agreement, to breaches for fiduciary duty that occurred after

---

[30] Kelley has not consistently identified John as a defendant in his capacity as either a member or manager of Killybegs. (See Pl.'s Br. at 2 (indicating that Kelley is suing John "individually and as a co-trustee of the Trusts").) In her reply brief, Kelley acknowledges that John is not liable for his involvement in Killybegs. (Pl.'s Reply Br. at 15.) The court agrees with Kelley that she has not set forth a claim against John under Count III of her amended complaint.

November 8, 2013 because Kelley did not gain an interest of any kind in the LLC until she became a co-trustee in the Family Trust upon her mother's death.[31]

The Company Agreement explicitly sets forth the duties owed by manager in § 6.07. (Pl.'s Ex. 13 at PL-160.) It limits liability to acts or omission that either qualify as gross negligence or willful misconduct or constitute a breaches of the agreement—but excludes liability for breaches of fiduciary duties to the extent they are not expressly recognized in the agreement:

> A Manager shall be liable to the Company and the other Members for acts or omissions in the management of the Company only in the case of gross negligence, willful misconduct or breach of this Agreement by such Manager; but a Manager shall not be liable to the Company or any other Member for any other acts or omissions, including negligence, strict liability or other fault or responsibility (short of gross negligence, willful misconduct or breach of this Agreement) by such Manager. Except for such duties as may be expressly set forth in this Agreement, a Manager *shall* not be subject to any duties (*including fiduciary duties*) in the management of the Company.

(*Id.* (emphasis added).) This section appears on its face to accord with the § 7.001(b) and § 7.001(d) of Texas Business Organizations Code, which permits such a limitation on liability subject to the exceptions in § 7.001(c). Although the agreement details several governing principles, it does not recognize a single fiduciary duty owed by Kathleen or Brian as managers

---

[31] In arguing her claims against Killybegs, Kelley spells out several alleged breaches of fiduciary duty by Rita even though she only names the Individual Defendants in her amended complaint as the liable parties for Count III. (Am. Compl. at 17; Pl.'s Br. at 12–13, 31.) Kelley has not cited to any governing law that provides her a cause of action for alleged mismanagement that predates her membership in LLC. Instead, she points out that the court decided in its April 22, 2015 order that the Maine statute of limitations would apply to any suit against Killybegs. *See O'Shea v.* O'Shea, CV-14-157, 2015 Me. Super. LEXIS 122, at * 11 (Apr. 22, 2015) (citing to *Johnson v. Dunnington*, 2001 ME 169, ¶ 16, 785 A.2d 1244). What Kelley fails to recognize is that this decision on the applicable statute of limitations pertains to the court's *forum non conveniens* analysis for claims against Killybegs itself; it does not provide her with standing to bring a claim against Rita's estate related to her decisions as Killybegs's manager. So there is no confusion, the court finds that Kelley's claims as they relate to Rita's management of Killybegs are not actionable given Kelley's lack of a legal interest in Killybegs during Rita's lifetime even though Maine's statute of limitations applies to Kelley's claim against Killybegs.

34

of Killybegs to the LLC itself or its members.[32] Therefore, the degree to which either of them are liable depends on whether their conduct triggers any of the four exceptions in § 7.001(c).

First, Kelley has not put any facts before this court to support a claim that Kathleen or Brian either owned her a duty of loyalty as a member of the LLC or breached such a duty by acting in bad faith or while subject to a conflict of interest. Tex. Bus. Orgs. Code § 7.001(c)(1); *see Pinnacle Data Servs., Inc. v. Gillen*, 104 S.W.3d 188, 198 ("[T]he duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation."). In support of her claim, Kelley points to the lack of evidence that Brian and Kathleen made in-kind contributions to Killybegs equal to the amount contributed from Family Trust funds as proof that they did not deposit such funds. (Pl.'s Br. at 31.) But the court did hear credible testimony that the Individual Defendants *did* contribute funds into Killybegs to pay bills incurred in the maintenance of the Kennebunkport home. (Tr. 3 at 219:10–21.) Kelley did not provide evidence that this contribution was insufficient given the costs associated with the house and the revenue it generated as a rental property. As with Kelley's claim for breach of contract, she cannot carry her burden of proof in showing a breach of fiduciary duty if she does not adduce to *any* evidence that a breach in fact occurred. Second, Kelley has not provided evidence that Kathleen or Brian breached a fiduciary duty, to the extent one is recognized in the Company Agreement, in bad faith; engaged in intentional misconduct; or knowingly violated the law. Tex. Bus. Orgs. Code § 7.001(c)(2). Third, she has not pointed to

---

[32] It is important to recognize that Kelley's claim is as a co-trustee of the Family Trust, which itself is a member of the LLC. She has not brought a derivative suit as a member on behalf of Killybegs for harm done to the LLC by Kathleen and Brian. *See* Tex. Bus. Orgs. Code §§ 101.451–101.463 (outlining the procedure for initiating and litigating a derivative proceeding against a limited liability company). Therefore, her ability to show a breach of fiduciary duty depends on the rights recognized in the Company Agreement and under Texas law for someone in her position to assert a claim for damages against a LLC's managers.

any transaction from which either Brian or Kathleen received an improper benefit. *Id.* § 7.001(c)(3). Neither Kathleen or Brian receive compensation for managing Killybegs, which means that they do not even benefit indirectly as a result of their positions within the LLC. (Tr. 3 at 222:13–18.) Fourth and finally, Kelley has not identified any conduct undertaken by Kathleen or Brian as managers of Killybegs that constitutes a violation of Texas law. *Id.* § 7.001(c)(4). Because the company agreement does not impose a fiduciary duty on Kathleen or Brian and Kelley has not established that their actions violate § 7.001(c) of the Texas Business Organizations Code, Kelley has not carried her burden of proof as to the third count of her amended complaint.

### D. Fraud by Individual Defendants Against the Trusts and Rusty's Estate (Count V)

Kelley alleges that the Individual Defendants are liable for fraud on two grounds, to wit, (1) they made materially false representations about how Rita managed the Trusts and Killybegs and (2) Rita, not the Individual Defendants, fraudulently concealed the distributions made from the Trusts and the conveyance of the Kennebunkport home into Killybegs.[33] (Pl.'s Am. Compl. at 21–22; Tr. 1 at 141:25–142:4; Tr. 2 at 16:10–11.) Kelley's claims do not hold water under Maine law for the following reasons.

To recover for fraudulent misrepresentation, a plaintiff must establish that (1) there is a false representation (2) of a material fact, opinion, intention or law (3) with knowledge as to the falsity of the representation or a reckless disregard as to its veracity (4) for the purpose of inducing another to act or refrain from acting in reliance upon it and (5) the person justifiably relies on the

---

[33] In her post-trial brief, Kelley outlines her case for fraudulent concealment in terms of Rita's actions as trustee of the Trusts. (Pl.'s Br. at 32–33.) The Individual Defendants are not mentioned, nor did Kelley couch her claim against Kathleen and Brian in terms of their roles as co-trustees of Rita's estate. Because Kelley's amended complaint is against the Individual Defendants and not Rita's estate, this court's review of Kelley's claim is limited to the acts or omissions of Kathleen, Brian and John.

representation as true by acting upon it to her detriment. *Cianchette*, 2019 ME 87, ¶ 20, 209 A.3d 745. Kelley testified that she believed the Individual Defendants committed fraud when they represented to her that "the Trust[s] and Killybegs were handled in an appropriate manner," that "they believed that Rita had taken care of the Trusts to the terms of the Will," and that Rita had "done a good job" in her management of the Trusts. (Tr. 1 at 141:24–142:4; Tr. 2 at 17:5–18:23.)

Kelley's fraudulent misrepresentation claim is fatally defective because she did not present evidence at trial to satisfy any of its elements. There is no evidence before this court that the Individual Defendants misrepresented a material fact or their opinion regarding the management of the Trusts, stated their belief that the Trusts were properly managed with knowledge that this representation was false, or that they shared their opinion with Kelley to either induce her to act or refrain from acting. Nor has Kelley established that she relied on the Individual Defendants' statements, let alone that she did so to her detriment. Instead, Kelley testified that after the Individual Defendants shared their opinion regarding Rita's conduct as trustee, she responded by searching the family home in Lubbock for documents so that she could find out for herself how Rita managed the Trusts and Killybegs. (Tr. 1 at 35:14–24.) These actions are highly suggestive that she did not take their representations at face value or rely on them in any way. Collectively, Kelley failed to provide the evidence necessary to support a claim for fraudulent misrepresentation, which means that the Individual Defendants cannot be held liable for their statements to Kelley concerning how Rita acted as trustee of the Trusts and manager of Killybegs.

The second ground on which Kelley seeks relief is for fraudulent concealment, which requires her to establish that (1) there was a failure to disclose (2) a material fact (3) where an equitable duty to disclose the fact exists (4) with the intention of inducing the person raising the

37

claim to act or refrain from acting in reliance on the nondisclosure and (5) that the aggrieved party in fact relied on the concealment to her detriment. *Picher v. Roman Catholic Bishop of Portland*, 2009 ME 67, ¶ 30, 974 A.2d 286. Beyond the fact that Kelley has not explained how the Individual Defendants might be liable for Rita's alleged fraudulent concealment, she has not set forth the facts necessary to succeed on her claim. Specifically, she has demonstrated that Rita owed her an equitable duty to disclose facts related to either the conveyance of the Kennebunkport home into Killybegs or distributions from the Trusts.[34] *See Morrow v. Moore*, 98 Me. 373, 57 A. 81 (1903) (explaining that the withholding of information, in and of itself, is not fraudulent concealment absent a duty to disclose), *overruled on other grounds by Rulon-Miller v. Carhart*, 544 A.2d 340, 342 (Me. 1988). The terms of Rusty's Will, which govern any duty owed by Rita as trustee of the Family Trust, explicitly provides that she was not required to affirmatively account to anyone other than the primary beneficiary (i.e., herself). (Will § 10.2.) Instead, the Will, at most, provided Kelley the right to demand that Rita disclose records to her as a permissible beneficiary. Since Kelley did not offer any evidence that she did, in fact, make such a demand, Kelley has not established that that Rita owed her a duty—legal or equitable—to keep Kelley abreast of her management of the Trusts and her decision-making regarding her transfer of the Kennebunkport home into Killybegs.

## E. Conversion by Kathleen, Brian, John and Killybegs (Count VI)

Nor has Kelley set forth evidence that the Individual Defendants or Killybegs are liable for conversion of trust property. Under Maine law, a defendant is liable for conversion only if (1) the

---

[34] Kelley's reliance on *Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984) is misplaced. In that case, the party claiming that a trustee had an equitable duty to disclose information related to the management of the trust was a life beneficiary of the decedent's estate. Here, Kelley's rights vis-à-vis the Family Trust was as only a permissible beneficiary. Nor can Kelley rely on 18-B M.R.S. § 813; any duties stemming from this court's interpretation of the Will are governed by Texas law pursuant to 18-B M.R.S. §§ 107–108.

plaintiff has a property interest in the property allegedly subject to conversion; (2) the plaintiff's rights included a right to possession at the time of the alleged conversion; (3) the plaintiff demanded the property's return and that demand was denied by the party with possession. *Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 14, 157 A.3d 769. Whether interference with a person's right to property is of sufficient severity to constitute conversion depends on the extent and duration of the other person's exercise of dominion or control; whether the other person acted in good faith; the extent and duration of the resulting interference with the claimant's right to control, to the extent it exists; the resulting harm; and the inconvenience and expense caused to the property's owner. *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 12, 48 A.3d 774. This interference must go "beyond a brief and ultimately harmless withholding" to qualify as conversion. *Id.*

The essence of Kelley's conversion claim is that the Individual Defendants converted property belonging to the Trusts by making impermissible distributions—i.e., using its assets to pay legal expenses, settle Rita's estate, and maintain the Kennebunkport home. (Pl.'s Br. at 33–34.) To start, Kelley's conversion claim is limited to property she was entitled to possess, which means that she cannot maintain a claim for conversion for distributions made by Rita from the Trusts because Kelley was only a permissible beneficiary of the Family Trust without a right to possess during Rita's life. This court agrees with the Texas Court of Appeals that "[a]t best, John's Will gives his descendants, including Kelley, the *possibility* of a distribution from the Family Trust during Rita's lifetime or an inheritance from the Martial Deduction and Family Trusts' assets upon Rita's death." *O'Shea*, 2012 Tex. App. LEXIS 64, at *11 (emphasis in original). Consequently, any conversion claim only survives as to the Individual Defendants for actions they have taken as co-trustees of the Trusts and as to Killybegs for property it allegedly

39

converted after Kelley gained an interest in it as a co-trustee of the Family Trust. As to claims for distributions after November 8, 2013, Kelley has not established that the Individual Defendants converted trust property by drawing on trust funds to pay legal expenses incurred in this or prior litigation because the Will expressly provides its trustee(s) with the right to "commence or defend, *at the expense of my estate or of any trust*, such litigation with respect to my estate or any trust." (Will § 10.1(o) (emphasis added).) Even if this court accepts Kelley's argument that Texas law prohibits trustees from being reimbursed for attorneys' fees if they are found to have committed a breach of trust, the facts here support the exact opposite conclusion—i.e., that the Individual Defendants did not breach their fiduciary duties to the Trusts. *See duPont v. S. Nat'l Bank*, 575 F. Supp. 849, 864 (S.D. Tex. 1983), *aff'd in part, rev'd in part on other grounds*, 771 F.2d 874 (5th Cir. 1985) ("[W]here litigation results from the fault of the trustee, he is not entitled to charge the expenses of litigation against the trust estate."). The Individual Defendants are not barred by law or by the terms of Rusty's Will from using trust funds to cover litigation costs, which means they did not convert trust property when they paid these expenses from trust funds. Similarly, the Individual Defendant did not commit conversion when they used trust funds to settle Rita's estate given the express authorization to do so in § 4.3 of Rusty's Will. Kelley has also not provided evidence that the amount in Family Trust funds paid into Killybegs were disproportional given the its interest in the property, the expenses associated with the Kennebunkport home and the revenue the home generates from rentals. Since Kelley has not carried her burden of proof as to the causes of action that provide the factual predicate for conversion claim, she cannot recover for conversion.

**F. Violation of the Maine Fraudulent Transfers Act (Count VII)**

The final substantive claim[35] Kelley asserts is that the Individual Defendants are liable for when Rita allegedly violated the UFTA by placing the Kennebunkport home into Killybegs in an attempt to avoid the repercussions of the 2011 Final Judgment. Because this court finds that Rita complied with the 2011 Final Judgment, Kelley has not set forth the factual predicate for a MFTA violation.

A claim under the MFTA exists in this case only if Kelley could establish that (1) the Trusts qualify as a creditor; (2) Rita was a debtor vis-à-vis the Trusts; and (3) either (a) Rita transferred assets with actual intent to hinder, delay or defraud the trust as a creditor or (b) "[w]ithout receiving a reasonably equivalent value in exchange for the transfer" Rita (i) engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small or (ii) intended to incur, believed she would incur, or should have reasonably believed she would incur debts beyond her ability to pay them. 14 M.R.S. § 3575(1); *see* 14 M.R.S. § 3572 (defining "insolvency"). Under the Act, a creditor is a "person with a claim" while a "debtor" is a "person who is liable on a claim." 14 M.R.S. §§ 3572(5), (6). A claimant is required to prove intent by clear and convincing evidence. *Morin v. Dubois*, 1998 ME 160, ¶ 5, 713 A.2d 956. In deciding if Rita acted with actual intent to hinder, delay or defraud the Trusts as a creditor, the court may take into account, amongst other possible factors, whether the transfer occurred to an "insider." 14 M.R.S. § 3575(2)(A).

Kelley's claim is without merit because Rita and the Trusts were not bound by a creditor-debtor relationship given Rita's compliance with the 2011 Judgment. Rita transferred $32,462.35 from the Family Trust account into the Marital Trust account after the judgment was entered on

---

[35] The remaining counts in Kelley's amended complaint and the various demands she made upon this court are best construed as the remedies she seeks for any liability placed upon the Individual Defendants as a consequence of counts I through VII.

41

the record. (Tr. 3 at 132:12–22; Defs.' Ex. 8-A at DEF-0138.) She was under no obligation to transfer additional funds from the Family Trust into the Marital Trust; instead, the District Court ordered her to hold the net proceeds from her sale of the Marital Trust's one-half interest in the office building and parking lot in the Family Trust, which she did. (Pl.'s Ex. 5 at PL-041.) Because Rita was not a debtor vis-à-vis the Trusts, Kelley cannot obtain relief under the UFTA.

Assuming for a moment that Kelley established that Rita did not abide by the 2011 Judgment, she would still not be able to recover under the UFTA because she has not provided evidence that a "fraudulent transfer" occurred when Rita conveyed the Family Trust's interest in the Kennebunkport property into Killybegs or when she transferred her personal interest in Killybegs to the Individual Defendants. Kelley has not proven that Rita acted with actual intent to hinder, delay or defraud or that she intended to or in fact became insolvent as a result of the transfer. Kelley is correct that Rita transfer the house into Killybegs to avoid liability, but only as to any claim by its renters—not to place the property beyond the Kelley's reach in attempting to enforce the 2011 Judgment. (Tr. 3 at 217:7–14; Tr. 4 at 101:8–18.) She also correctly points out that Rita's transfer of her personal interest in the Kennebunkport home was to an "insider" as the term is defined under the UFTA, but that factor alone is not sufficient to prove actual intent. 14 M.R.S. § 3572(7) (including "a relative of the debtor" within the definition of an "insider"); 14 M.R.S. § 3575(2) (listing a transfer to an "insider" amongst eleven indicators of a debtor acting with intent). Consequently, she must prove that the Rita was insolvent—either before the transfer or as a result of it. *See* 14 M.R.S. § 3573(1) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."); 14 M.R.S. § 3573(2) ("A debtor who is generally not paying his debts as they become due is presumed to be insolvent."). Kelley has failed to do so. The evidence presented at trial shows that Rita's estate was valued at

42

$490,998.96—an amount in assets in excess of any debt she owed.[36] Consequently, even if this court determined that Rita did not satisfy the 2011 Judgment, Kelley could not recover under the UFTA.

## G. Constructive Trust (Count VIII)

Kelley's argument that this court should order property held in a constructive trust is completely dependent on this court finding in Kelley's favor on her various claims through which she attempts to recover for what she perceives to be impermissible distributions from the Trusts, including the conveyance of the Family Trust's interest in the Kennebunkport home into Killybegs. But Kelley has not carried her burden of proof on any of her claims, which means a constructive trust would be impropriate in these circumstances. A constructive trust serves as an equitable remedy to prevent unjust enrichment by subjecting a person holding title to a property to an equitable duty to convey it to another regardless of the parties' intentions. *See Estate of Campbell*, 1997 ME 212, ¶ 5, 704 A.2d 329; *Gaulin v. Jones*, 481 A.2d 166, 168 (Me. 1984). Constructive trusts exist to rectify unjust enrichment. When, as here, the plaintiff has not demonstrated that the defendants have been unjustly enriched, the court will not impose a constructive trust.

## H. Punitive Damages (Count IX)

Nor will this court award punitive damages. Kelley argues that punitive damages are proper because Rita, the Individual Defendants and Killybegs acted maliciously. In particular, Kelley claims that the Rita and the Individual Defendants acted with malice by attempting to punish her for pursuing legal action against them, such as when Rita disinherited Kelley and her

---

[36] Because the court has not found in Kelley's favor in any of the counts in her amended complaint, it will not assess the amount in damages Kelley claims she and/or the Trusts are owed in deciding whether or not Rita qualified as insolvent at any point subsequent to her transfer of the Family Trust's interest in the Kennebunkport home into Killybegs in 2009.

descendants through her will and removed Kelley as a beneficiary from her life insurance policies. (Tr. 1 at 34:14–17, 52:17–19, 60:17–21; Pl.'s Br. at 37–38.) The court cannot award punitive damages unless Kelley establishes that the defendants acted maliciously *and* tortuously. *Waxler v. Waxler*, 1997 ME 190, ¶ 15, 699 A.2d 1161. In this context, malice can exist in fact if the defendant's conduct was motivated by actual ill will or by implication if the defendants' actions were sufficiently outrageous. *Fine Line, Inc. v. Blake*, 677 A.2d 1061, 1065 (Me. 1996). Here, the court heard credible testimony that the Individual Defendants never tried to punish her for suing them or their mother. (Tr. 3 at 198:9–11, 205:1–6; Tr. 4 at 96:4–97:1.) Kelley did not provide any evidence that Rita, in fact, acted with malice when she disinherited Kelley; nor has Kelley explained why Rita's decision to disinherit her daughter after Kelley filed several lawsuits against her is so outrageous that this court should presume that Rita acted maliciously. Absent such a showing, this court is not permitted to award punitive damages.[37]

## I. Other Matters

### 1. Satisfaction of 2011 Judgment

Rita satisfied the 2011 Judgment entered by the 237th District Court of Lubbock County, Texas by transferring funds from the Family Trust into the Marital Trust to cover for her accounting error in excess of the $30,000 she was ordered to deposit. (Tr. 3 at 132:12–22; Pl.'s Ex. 5 at PL-041; Defs.' Ex. 8-A at DEF-0138.) It is irrelevant that Rita later distributed to herself as the sole beneficiary of the Marital Trust an amount in excess of the amount deposited because she had the authority to do so under the unambiguous terms of Rusty's Will. (Will § 4.2.) The purpose of this deposit was to remedy Rita's accounting error—i.e., her mistaken withdrawal

---

[37] Even if Kelley provided sufficient evidence that the defendants' conduct qualifies as malicious, her claim fails because she has not satisfied the second prong of the analysis—i.e., that the defendants acted tortuously. *See Waxler*, 1997 ME 190, ¶ 15, 699 A.2d 1161.

44

from the Marital Trust of funds used to purchase an vehicle for Kathleen when adequate monies were available in the Family Trust for her to make an identical distribution. (Pl.'s Ex. 5 at PL-041.) Kelley's contention that Rita needed to keep $30,000 in the Martial Trust in perpetuity accords with neither the 2011 Judgment or the Will's plain language. Similarly, Rita complied with the 2011 Judgment by leaving assets in the Family Trust in constructive trust. The District Court never required her to, in fact, transfer funds from the Family Trust to the Martial Trust for one-half of the value of the distributions she made to her descendants from the revenue generated by the sale of the building and parking lot. (Pl.'s Ex. 5 at PL-041.) Therefore this court will not declare that liability exists on any defendant on the grounds that Rita did not abide by the District Court's judgment.

### 2. *Attorneys' Fees for 2011 Judgment*

The 2011 Judgment did not order Rita to pay her attorneys' fees from her personal funds. Instead, the District Court ordered "each party to bear their own attorneys [sic] fees and costs incurred in this matter." (Pl.'s 5 at PL-042.) Kelley reads this language to mean that Rita was barred from using trust funds to defend her actions as trustee. No such prohibit exists in the 2011 Judgment. Instead, the District Court appears to be indicating that it will not require either party to pay their adversary's fees. Kelley's interpretation also ignores the provisions in Rusty's Will that provide Rita with broad discretion as trustee to make distributions to herself as the sole beneficiary of the Marital Trust and primary beneficiary of the Family Trust and language that expressly permits any trustee to use trust funds to defend herself in litigation. (Will §§ 4.2, 6.2, 10.1(o).) Even if Kelley could establish that the 2011 Judgment prevents Rita from allocating trust funds as *trustee* to defend herself pursuant to § 10.1(o), she has not explained why Rita would be prohibited from receiving a distribution as a *beneficiary* to cover her expenses under

45

either § 4.2 or § 6.2. Consequently, this court will not order Rita's estate to reimburse the Trusts for the amount Rita distributed and/or allocated to cover attorneys' fees associated with the 2009 Texas Lawsuit.

### 3. Attorneys' Fees for Instant Case

This court recognizes no grounds on which to justify awarding Kelley attorneys' fees associated with this litigation. In support of her argument, Kelley cites to 18-C M.R.S. § 1-601 and *In re Estate of Stowell*, 636 A.2d 440 (1994)—both of which concern the discretionary power of a court overseeing a contested probate proceeding to assess costs on one party or the other. Kelley's reliance on this law is misplaced. This court is not in the process of probating an estate so neither § 1-601 of the Maine Probate Code or the Law Court's decision in *Stowell* apply here. Not reading in Kelley's brief any other legal basis on which to assess her litigation costs on defendants, this court will not award attorneys' fees in contravention of the default rule that each party pays his or her own way. *In re Estate of McCormick*, 2001 ME 24, ¶ 20, 765 A.2d 552 ("In the absence of a statute or some exception recognized at common law, the American Rule provides that parties to litigation pay their own attorney fees.").

### 4. Rescission of Deed Conveying Kennebunkport Home into Killybegs

Kelley essential argues that the deed Rita executed conveying her personal one-half interest and the Family Trust's one-half interest in the Kennebunkport home to Killybegs in 2009 should be rescinded on one of two bases—either her breach of contract claim (Count II) or as a result of Rita's alleged violation of the UFTA (Count VII). Kelley adduces to no authority that would permit this court to cancel this deed. Given the absence of support for Kelley's position and its

46

decision against her on both counts, this court will not in any way modify or cancel the deed conveying the Kennebunkport home into Killybegs.

### 5. Rescission of Change of Beneficiaries Forms

Beyond claiming that the Individual Defendants are liable for Rita's breach of her fiduciary duty by removing Kelley as a beneficiary on Rita's Metlife and Transamerica insurance policies, Kelley argues that this court should void the change of beneficiaries because Rita's signatures on the them were forged. (Tr. 1 at 147:19–148:18, 157:1–3.) In particular, Kelley alleges that credit card statements on and around May 15, 2012, the day Rita met with Michael Gomez to change the policies' beneficiaries, suggest that Rita was not in Lubbock, Texas but instead in Maine. (Tr. 1 at 151:10; Pl.'s Ex. 11, PL-138.) The factual record does not support Kelley's position. Evidence introduced at trial show multiple charges in early May in Texas *and* Maine, which suggests that more than one person had a card connected to Rita's accounts. Kelley admitted as much on cross examination. (Tr. 1 at 192:23.) In addition, the court heard credible testimony that multiple family members had cards that drew from Rita's accounts. (Tr. 3 at 40:7–20; Tr. 4 at 63:13–19.) Not finding Kelley's version of events believable, this court will not void Rita's change of beneficiaries on her life insurance policies.

### 6. Conservatorship

Finding entirely in favor of the defendants, this court sees no reason to appoint a conservator to oversee management of the Trusts going forward.

### III.  Conclusion

For the foregoing reasons, judgment is entered as follows.

As to each and every claim raised by plaintiff Kelley O'Shea in her amended complaint (Counts I–IX) and at trial, including every ground on which she seeks relief for such claims, judgment is entered for Kathleen O'Shea, in her individual capacity, as co-executor of Rita's estate, as co-trustee of the Trusts, and as a manager of Killybegs, LLC; for Brian O'Shea, in his individual

47

capacity, as co-executor of Rita O'Shea's estate, as co-trustee of the Trusts, and as a manager of Killybegs, LLC; for John O'Shea, in his individual capacity, as co-trustee of the Trusts, and as a manager of Killybegs, LLC; and for Killybegs, LLC.

The Clerk is directed to incorporate this Judgment and Order into the docket by preference pursuant to M.R. Civ. P. 79(a).

Dated: 2/28/2020

_____
John O'Neil, Jr.
Justice, Superior Court

ENTERED ON THE DOCKET ON: 2/28/2020

48

**ALFSC-CV-2014-157**

**PLAINTIFF ATTORNEY:**

BRIAN CHAMPION ESQ
LIBBY O'BRIEN KINGSLEY & CHAMPION
62 PORTLAND RD STE 17
KENNEBUNK ME 04043

PRO HAC VICE:
JEFFREY DUNCAN ESQ
DUNCAN LAW PC
PO BOX 7896
JUPITER FL 33468

**DEFENDANTS ATTORNEY**
TOBY DILWORTH ESQ
AMY OLFENE ESQ
DRUMMOND WOODSUM
84 MARGINAL WAY STE 600
PORTLAND ME 04101

ANDREW DUCHETTE ESQ (KILLYBEGS LLC)
TAYLOR MCCORMACK & FRAME LLC
30 MILK ST 5TH FLR
PORTLAND ME 04101

STATE OF MAINE                              SUPERIOR COURT
YORK, ss.                                   Civil Action
                                            DOCKET NO. CV-14-157

KELLEY ANN O'SHEA,                    )
                                      )
            Plaintiff,                )
                                      )      **ORDER ON PENDING MOTIONS**
      v.                              )
                                      )
KATHLEEN M. O'SHEA,                   )
                                      )
BRIAN CONNOR O'SHEA,                  )
                                      )
JOHN J.C. O'SHEA, III,                )
                                      )
and                                   )
                                      )
KILLYBEGS, LLC,                       )
                                      )
            Defendants.               )

## I.     BACKGROUND

The instant lawsuit arises out of two trusts established by John J.C. "Rusty" O'Shea in his Last Will and Testament (the "Will"). (Def.'s Supp'g S.M.F. ¶ 3.) During his life, Rusty was married to Rita O'Shea ("Rita"). They had four children: plaintiff Kelley Ann O'Shea ("Kelley") and defendants Kathleen M. O'Shea ("Kathleen"), Brian Connor O'Shea ("Brian"), and John J.C. O'Shea ("John") (collectively the "Individual Defendants"). (Def.'s Supp'g S.M.F. ¶ 1.) The Individual Defendants are also the co-executors of Rita's estate.

Rusty passed away in November of 1996 and his Will was executed and probated in Lubbock County, Texas, where Rusty and his family had resided since 1964. (Def.'s Supp'g S.M.F. ¶¶ 3-4.) Rita inherited one-half of the couple's community property following Rusty's

1

death. (Def.'s Supp'g S.M.F. ¶¶ 11) Additionally, Rita inherited all of Rusty's personal property pursuant to his Will. (Def.'s Supp'g S.M.F. ¶ 7.)

Rusty's Will also established two trusts: the Marital Deduction Trust (the "Marital Trust") and the Family Trust (collectively, the "Trusts"). (Def.'s Supp'g S.M.F. ¶ 8.) Rita was appointed as executrix of Rusty's estate and also sole trustee of the Trusts. (Def.'s Supp'g S.M.F. ¶¶ 5, 9.) Rita had discretion over how Rusty's remaining assets were to be apportioned between the Trusts. (Def.'s Supp'g S.M.F. ¶¶ 12-13.) To this end, Rita worked with attorney Gary Ward to decide how to best apportion the property. (Def.'s Supp'g S.M.F. ¶ 14.)

At the time of its creation, the Marital Trust held stocks and a half interest in several pieces of real estate, including the family residence in Lubbock, Texas and a sixteen-acre parcel of land with a barn for boarding horses and riding stables. (Def.'s Supp'g S.M.F. ¶ 25.) The Family Trust held the majority of Rusty's stock portfolio and a half-interest in a summer home in Kennebunkport, Maine. (Def.'s Supp'g S.M.F. ¶ 26.)

Rita was the sole beneficiary of the Marital Trust and the primary beneficiary of the Family Trust during her life. (Def.'s Supp'g S.M.F. ¶¶ 15, 16.) Plaintiff and the Individual Defendants were permissible distributees of the Family Trust. (Def.'s Supp'g S.M.F. ¶ 17.) Upon Rita's death and following the administration of her estate, the Trusts were to terminate and any remaining property was to be distributed to Rita and Rusty's children *per stirpes* in the form of separate trusts in each child's name. (Def.'s Supp'g S.M.F. ¶¶ 19, 24.)

Rusty's Will gave the trustee of the Trusts the authority to exchange, sell or lease Trust assets; invest assets; hold trust property in their own name; enter into contracts on behalf of the Trusts, lend money or property of the Trusts to their beneficiaries; pay Trust expenses from Trust income or principal; and make distributions to beneficiaries "without any obligations to make

2

proportionate distributions or to distribute to all beneficiaries property having equivalent value." (Def.'s Supp'g S.M.F. ¶ 27.) As trustee, Rita could also retain Trust property without liability for depreciation or loss and was "indemnified and saved harmless from any liability" from such action, so long as it was "done in good faith and without gross negligence, including without limitation indemnity for . . . ordinary negligence." (Def.'s Supp'g S.M.F. ¶ 28.)

While she was trustee, Rita moved the two pieces of property she owned jointly with the Trusts into two separate limited liability companies, of which she and the Trusts held equal membership interests. (Def.'s Supp'g S.M.F. ¶¶ 29, 33.) The sixteen-acre parcel and horse barn in Lubbock half-owned by the Marital Trust was moved into Brehon, LC ("Brehon") in January of 1999. (Def.'s Supp'g S.M.F. ¶ 29.) Rita sold both her and the Marital Trust's interest in Brehon to Kathleen in December of 2004. (Def.'s Supp'g S.M.F. ¶ 31.)[1] The Kennebunkport summer home half owned by the Family Trust was moved into defendant Killybegs, LLC ("Killybegs") in March of 2009. (Def.'s Supp'g S.M.F. ¶ 33.) In 2012, Rita transferred her interest in Killybegs to the Individual Defendants; the Family Trust retains its half-interest. (Def.'s Supp'g S.M.F. ¶¶ 34-35.)

Additionally, Rita sold an office building and parking lot that were half owned by the Marital Trust and half owned by Rita in 2005 and 2007 respectively, using the proceeds to make gifts to each of her children, including Kelley Ann. (Def.'s Supp'g S.M.F. ¶¶ 36-38.)

This is not the first lawsuit concerning the Trusts by plaintiff. Plaintiff first brought suit in the 237th District Court of Lubbock County, Texas ("Lubbock District Court") in 2008. (Def.'s Supp'g S.M.F. ¶ 39.) Plaintiff voluntarily dismissed this case without prejudice and later "rebrought the same case" naming Rita and Kathleen as co-defendants in October of 2009 (the "2009 Texas Lawsuit"). (Def.'s Supp'g S.M.F. ¶¶ 40-41.) The suit alleged fraud and breach of

---

[1] Plaintiff disputes that Brehon was properly sold to Kathleen. (Pl.'s Opp. S.M.F. ¶¶ 31-32, 75.)

3

fiduciary duty to the Trusts and Rusty's Estate against Rita, constructive trust, and conversion of Trust and estate property, including Brehon by both Rita and Kathleen. (Def.'s Supp'g S.M.F. ¶ 43.)

Following discovery, Kathleen and Rita each moved for summary judgment. (Def.'s Supp'g S.M.F. ¶ 46.) The Lubbock District Court granted the motions in part, dismissing the conversion claim against both defendants. (Def.'s Supp'g S.M.F. ¶¶ 46-47.) The Court also held that plaintiff was barred by from raising issues that arose before October 19, 2005 due to the applicable statute of limitations. (Def.'s Supp'g S.M.F. ¶ 48.)

The remaining claims went to trial in December of 2010. (Def.'s Supp'g S.M.F. ¶ 49.) On February 15, 2011, the Lubbock District Court entered a final judgment (the "2011 Judgment"), which held: (1) Rita had not spent more than authorized from the Marital Trust; (2) Rita was to reimburse the Family Trust for the purchase of a $30,000 trailer for Kathleen; (3) aside from the trailer, no other distributions from the Family Trust were improper; (4) one-half of the proceeds of the sales of the office building and parking lot were to be held in constructive trust for the Marital Trust's benefit; (5) to the extent that such funds were used to make gifts to Rita's children and grandchildren, the Family Trust was to reimburse the Marital Trust; (6) Rita's investment in Scopey Inc. was not improper; and (7) the parties were responsible for their own attorneys' fees and costs. (Def.'s Supp'g S.M.F. ¶ 51.) Additionally, the Court refused to remove Rita as trustee of the Trusts; find that Rita had committed fraud or breached any fiduciary duty; attach pre or post judgment interest; or award punitive damages. (Def.'s Supp'g S.M.F. ¶ 52.) Concerning the alleged improper distributions, the Lubbock District Court found:

> [T]hat despite referring to them as "gifts", Defendant Rita M. O'Shea as trustee of the Marital Trust has in fact made various distributions from the Marital Trust to the descendants of John J. C. O'Shea. The Court FINDS that Defendant Rita M. O'Shea has the authority as trustee of the Family Trust to make such distributions from the income and/or principal of the Family Trust as long as those distributions relate to the health, support, maintenance and education of each such distributee.

4

(Pl.'s Ex. L, 2011 Final Judgment at 2-3.)

The 2011 Judgment was appealed to the Texas Court of Appeals, which affirmed the 2011 Judgment (the "Appellate Judgment"). *Duncan v. O'Shea*, No. 07-11-0088-CV, 2012 Tex. App. LEXIS 6494 (App. Aug. 7, 2012) (Def.'s Supp'g S.M.F. ¶ 56.) No further appeal was taken. (Def.'s Supp'g S.M.F. ¶ 56.)

Several years later, plaintiff filed several motions with the Lubbock District Court seeking to modify and/or enforce the 2011 Judgment. (Def.'s Supp'g S.M.F. ¶¶ 57-58, 60-61.) The Court denied the motions. (Def.'s Supp'g S.M.F. ¶¶ 59, 61.) Plaintiff also filed an equitable bill of review requesting the Court set aside the 2011 Judgment with respect to conversion claims against Rita and Kathleen concerning Brehon's sale, which the Court also denied. (Def.'s Supp'g S.M.F. ¶¶ 71-72.) The Lubbock District Court's denial of the equitable bill of review is currently on appeal in Texas. (Pl.'s Opp. S.M.F. ¶ 71.)

Rita passed away on November 8, 2013. (Def.'s Supp'g S.M.F. ¶ 6.) Rita's Last Will and Testament ("Rita's Will") disinherited plaintiff and devised her assets to the Individual Defendants. (Def.'s Supp'g S.M.F. ¶ 62.)

Plaintiff brought suit against her siblings, Rita's estate and Brehon in the United States District Court for the District of Maine in February of 2014. (Def.'s Supp'g S.M.F. ¶ 64.) Plaintiff dismissed this suit before any action by the Court. (Def.'s Supp'g S.M.F. ¶ 66.) Later in 2014, plaintiff brought similar suits in both Maine and Texas state courts (the "2014 Texas Suit"). (Def.'s Supp'g S.M.F. ¶¶ 67, 69.) This case was stayed pending the resolution of the 2014 Texas Suit. (*See* Order on Def.'s Mot. Stay.) After plaintiff again voluntarily dismissed the 2014 Texas Suit without prejudice, the instant case resumed. (Def.'s Supp'g S.M.F. ¶ 82.)

5

Plaintiff's current action alleges: (1) breach of fiduciary duty to the Trusts and Rusty's estate by Rita (Count I); breach of contract in the purchase of the Kennebunkport home against Brian, Kathleen, and Killybegs (Count II); breach of fiduciary duty against the Individual Defendants as members of Killybegs (Count III); breach of fiduciary duty against Killybegs itself (Count IV); fraud against the Trusts and Rusty's Estate by the Individual Defendants (Count V); conversion against all defendants (Count VI); violation of the Maine Fraudulent Transfer Act against all defendants (Count VII); constructive trust (Count VIII); and punitive damages (Count IX). (Am. Compl. ¶¶ 83-207.)

To date, the court has received numerous motions by the parties. Currently before the court are Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment; Plaintiff's Motion to Strike Defendants' Affirmative Defenses; Plaintiff's Motion to Strike Defendants' Expert Witness Designation; Plaintiff's Motion to Strike Defendants' Reply Brief in their Motion for Partial Summary Judgment; Defendants' Motion for Partial Summary Judgment; and Plaintiff's Motion for Summary Judgment. Each of these motions will be addressed in turn below.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821 (internal citation and quotation marks omitted). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.* In order to survive defendants' motion for summary

6

judgment, plaintiff must set forth a prima facie case of each element of her cause of action. *Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346 (citation omitted).

### III. DISCUSSION

#### a. Motions to Strike

##### i. Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment

After plaintiff originally filed two motions for summary judgment totaling 112 pages and containing 414 statements of material fact, defendants successfully moved to strike the motions, asserting that they failed to comply with M.R. Civ. P. 56. The court, however, agreed to allow plaintiff to file another motion limited to 25 pages.

On October 3, 2017, plaintiff filed her instant motion for summary judgment, totaling 25 pages and accompanied by 408 statements of material fact. Defendants again moved to strike the motion, arguing that the exhibits attached to the motion were unauthenticated; that plaintiff's affidavit contained improper legal conclusions, opinions, facts of which she had no personal knowledge, and argumentative, compound statements; and that plaintiff's statement of material facts did not satisfy the standard as set forth in Rule 56.

Rule 56 states that a motion for summary judgment is to be supported by a "a separate, short, and concise" statement of material facts. M.R. Civ. P. 56(h)(1). This statement must be supported by "record references to evidence that is of a quality that would be admissible at trial." *HSBC Mortg. Servs. v. Murphy*, 2011 ME 59, ¶ 9, 19 A.3d 815.

There are myriad problems with plaintiff's cited evidence, including her own affidavit. Plaintiff's affidavit contains multiple legal conclusions and argumentative assertions that are contrary to Rule 56(e), which provides that affidavits in support of a motion for summary judgment must "be made on personal knowledge, shall set forth such facts as would be admissible in

7

evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." (*See* Pl. Ex. E, Kelley Ann O'Shea Aff. ¶¶ 4, 6, 10, 12, 56, 62, 65, 67, 77, 85.)

Further, "[i]f a party submits an unnecessarily long, repetitive, or otherwise convoluted statement of material facts that fails to achieve the Rule's requirement of a 'separate, short, and concise' statement, the court has the discretion to disregard the statement and deny the motion for summary judgment solely on that basis." *Stanley v. Hancock Cty. Comm'rs*, 2004 ME 157, ¶ 29, 864 A.2d 169; *see also First Tracks Invs., LLC v. Murray, Plumb & Murray*, 2015 ME 104, ¶ 3, 121 A.3d 1279 (per curiam).

Here, plaintiff's statement of material fact is unnecessarily long; contains repeated statements of fact; relies on unauthenticated exhibits; and cites to exhibits, some of which are hundreds of pages, without using pin cites. Additionally, plaintiff frequently uses many of these statements to support a single sentence of her brief. Given limited judicial resources, it is not the court's burden to independently sift through hundreds of pages of documents in search of evidence that supports plaintiff's contentions that are insufficiently referenced. *HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶ 17, 28 A.3d 1158. Because plaintiff's statement of material facts is significantly deficient, the court will deny plaintiff's motion for summary judgment. Thus, defendants' motion to strike is moot.

### ii. Plaintiff's Motion to Strike Defendant's Affirmative Defenses

After the close of discovery, plaintiff moved to strike defendants' affirmative defenses to the extent that she believes that insufficient evidence was developed during discovery to support the defense.

Rule 12(f) of the Maine Rules of Civil procedure provides that a motion to strike must be made "within 20 days after the service of the pleading upon the party . . . ." M.R. Civ. P. 12(f).

8

Defendants filed their answer on May 15, 2015. Plaintiff did not file her motion to strike until August 18, 2017. To the extent that there is insufficient evidence of defendants' defenses, the court will address these issues when they arise. However, plaintiff's motion to strike is not the proper method for such a determination.

Plaintiff also argues in her motion to strike that defendants are relying on an affirmative defense that was not pled in their answer, namely the application of certain exculpatory provisions in Rusty's Will and Killybeg's operating agreement. Both parties extensively discuss whether such a defense needed to be pled in defendants' answer. Practically, however, there is nothing for the court to strike. To the extent that plaintiff wishes to preclude defendants from asserting the defense, this motion to strike is, again, not the proper procedural vehicle. Consequently, plaintiff's motion is denied.

### iii. Plaintiff's Motion to Strike Defendants' Expert Witness Designation

As discussed previously with counsel and at oral argument, the court will consider any arguments concerning the qualifications of defendants' expert, Gary Lane, or the admissibility of his testimony upon a motion in limine or during trial. Plaintiff's motion to strike defendants' expert witness designation is denied.

### iv. Plaintiff's Motion to Strike Defendants' Reply Brief in their Motion for Partial Summary Judgment

On October 12, 2017, defendants filed their reply brief in support of their motion for partial summary judgment. The brief was ten pages long and accompanied with an additional statement of material facts containing fifteen new facts not submitted in their original statement. Plaintiff moved to strike the brief and its accompanying statement of fact, arguing that it is not permitted by the Rules of Civil Procedure.

9

Rule 7 of the Maine Rules of Civil procedure provides, "No reply memorandum shall exceed 7 pages." M.R. Civ P. 7(f). Defendants acknowledge that their reply memorandum exceeds this limit but argue that the remedy is not to strike the entire memorandum, but only the portion that exceeds the limit. Courts have imposed this limited remedy in similar instances. *Kastrenos v. D&E Developers*, No. RE-11-31, 2014 Me. Super. LEXIS 148, at *4 (Mar. 5, 2014); *Hawkes & Menhert v. Morse*, No. CV-06-188, 2007 Me. Super. LEXIS 214, at *2 (Oct. 15, 2007). Consequently, the court will grant plaintiff's motion to strike to the extent that defendants' reply brief exceeds the seven-page limit in Rule 7.

In regards to defendants' additional statement of facts, Rule 56 does not allow for the submission of further statements of material fact in reply briefs. *See* M.R. Civ. P. 56. Similar requests have been denied in the past. *O'Gara v. Horizon LLC*, NO. CV-15-250, 2016 Me. Super. LEXIS 134, n. 1. (July 26, 2016); *Barclays Capital Real Estate v. Hamilton*, NO. RE-08-038, 2008 Me. Super. LEXIS 162, n. 1 (May 23, 2008). Given the lack of procedural basis for the additional statement of facts and that, even if considered, the additional facts would be inconsequential to the court's decision on defendants' motion, the court will strike defendant's supplemental statement of facts.

Further, plaintiff argues that because defendants did not admit, deny, or qualify her additional statement of material facts, they are deemed admitted. *See* M.R. Civ. P. 56(h)(3). Instead of submitting an additional statement of material fact, plaintiff merely cited to the statement submitted with her own motion for summary judgment. Plaintiff did not even attach a copy of the statement to her motion. As discussed above, this statement of fact is contrary to Rule 56 and may be ignored. Consequently, the court will not deem defendants' failure to respond to the statement an admittance of its contents.

10

In her reply brief in support of her motion to strike, plaintiff also argues that because defendants did not admit, deny or qualify their own admissions, denials, and qualifications, that her responses are deemed admitted. (Pl.'s Repl. Mot. Strik Def.'s Repl. 2.) Defendants are not required by Rule 56 to respond to plaintiff's responses to their own statement of material facts; they are only required to reply to any additional facts submitted by the non-movant. *See* M.R. Civ. P. 56(h)(3). Consequently, none of plaintiff's responses are deemed admitted.

Finally, plaintiff requests that this court sanction defendants for filing the affidavit of Michael Gomez in bad faith pursuant to Rule 56(g). In his affidavit, Gomez testified, "On May 15, 2012, Rita came to my office in Lubbock, Texas, to fill out the paperwork necessary to change the beneficiaries of the life insurance Policies. Kathleen accompanied Rita on that visit. I recall them coming to my office so that Rita could change the beneficiaries of her life insurance policies," signing the relevant documents that day. (Gomez Aff. ¶¶ 10-13.) However, plaintiff has submitted credit card statements that show that Rita's credit card was used in Kennebunkport, Maine throughout the month of May, 2012. When asked hypothetically how Rita could have signed the document in Texas if she was in Maine, Kathleen stated, "She might have faxed [the signed document]. I don't know. I am not my mother's keeper. I wasn't there with her. I don't know." (Kathleen O'Shea Dep. 151.)

There is no indication that the affidavit was submitted in bad faith. At this stage, it is only apparent that there is a factual dispute concerning the validity of Rita's signatures on the change of beneficiary forms. The court thus denies plaintiff's request for sanctions.

### b. Defendants' Motion for Partial Summary Judgment

#### i. Res Judicata

11

The central issue of defendants' motion for partial summary judgment is relatively straightforward. As explained by defendants themselves, "Put simply, the doctrine of *res judicata* and collateral estoppel bar Plaintiff from raising any claim or litigating any issue that she litigated or could have litigated during the 2009 Texas Lawsuit, therefore limiting the relevant time period in this suit to claims arising in December 2010 forward." (Def.'s Mot. Summ. J. 13 n. 11.) Specifically, defendants claim that the Texas Courts have resolved the following:

(1) Whether Rita breached her fiduciary duty to the Trusts, committed fraud against plaintiff and/or the Trusts, or converted Trust property prior to the time of the trial in December of 2010;
(2) Whether any distribution that Rita made to herself from the Marital Trust before December 2010 was improper;
(3) Whether distributions from the Family Trusts prior to December 2010 were improper;
(4) Whether Rita's use of the Trust funds to pay her legal fees was improper;
(5) Whether Rita's investment in Scopey Inc. was improper;
(6) Whether Rita owed half the proceeds from the sale of the office and parking lot to the Marital Trust; and
(7) Whether pre or post-judgment interest applies to any damages award made in the 2011 Judgment.

(Def.'s Mot. Summ. J. 12.)

Generally, *res judicata* prevents relitigation of matters already decided. *Portland Water Dist. v. Town of Standish*, 2008 ME 23, ¶ 7, 940 A.2d 1097. "The law is plain that [parties] cannot again come forward in the same legal mission against the same parties to secure a remedy . . . previously denied." *Harriman v. Border Trust Co.*, 2004 ME 28, ¶ 5, 842 A.2d 1266 (quotation marks omitted). Thus, "[r]es judicata prevents a litigant from splintering his or her claim and pursuing it in a piecemeal fashion by asserting in a subsequent lawsuit other grounds of recovery for the same claim that the litigant had a reasonable opportunity to argue in the prior action." *Barth v. Town of Sanford*, Docket No. 01-208-P-C, 2001 U.S. Dist. LEXIS 17934, at *10-11 (D. Me. Nov. 5, 2001) (citation omitted). The doctrine consists of two components: issue preclusion and claim preclusion. *Portland Water Dist.*, 2008 ME 23, ¶ 7, 940 A.2d 1097 (citation omitted).

12

Claim preclusions prevents relitigation where: "(1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been litigated in the first action." *Macomber v. Macquinn-Tweedie*, 2003 ME 121, ¶ 22, 834 A.2d 131 (quotation marks omitted). The court uses a transactional test to determine whether claim preclusion bars an action, which examines "the aggregate of connected operative facts that can be handled together conveniently for purposes of trial to determine if they were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong." *Norton v. Town of Long Island*, 2005 ME 109, ¶ 18, 883 A.2d 889 (quotation marks omitted). A claim that meets this test is precluded even if the second action "relies on a legal theory not advanced in the first case, seeks different relief than that sought in the first case, or involves evidence different from the evidence relevant to the first case." *Id.* (quotation marks omitted).

Issue preclusion, on the other hand, "prevents the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding." *Macomber*, 2003 ME 121, ¶ 22, 834 A.2d 131 (quotation marks and alteration omitted). Unlike claim preclusion, issue preclusion concerns factual issues and applies even when the two proceedings offer different types of remedies. *Id.*

*Res judicata* is an affirmative defense. *Macomber v. Macquinn-Tweedie*, 2003 ME 121, ¶ 17, 834 A.2d 131. The party asserting application of the doctrine bears the burden of proving that an issue or claim is barred from adjudication. *Id.* ¶ 25 (citing 18 Charles Alan Wright, et al., Federal Practice and Procedure, § 4420, at 516-18 (2d ed. 2002)).

13

Defendants contend that all claims through the time of trial (December 15, 2010) are barred. On the other hand, plaintiff argues that the court only considered Trust activity through 2007, and that Rita never produced any of the Trusts' financial documents for 2008, 2009, or 2010 during the suit. (Pl.'s Opp. 5; Pl.'s Add'l S.M.F. ¶ 28.) As evidence of this contention, plaintiff points to Rita's discovery responses dated August 12, 2010 wherein she stated she was not yet able to provide information concerning distributions from the Trusts in 2008 or 2009. (Pl.'s Add'l S.M.F. ¶ 28.) Essentially, plaintiff is contending that they could not litigate claims relating to distributions that occurred after 2007 because plaintiff denied them discovery related to those distributions.

However, defendants note that plaintiff had other avenues, including requesting a discovery conference, issuing subpoenas on banks and other holders of the Trusts' financial records, or moving for a new trial based on newly discovered evidence that would provide her relief from any denial of discovery. Federal courts have held that because litigants are not entitled to discovery as a matter of right and that any discovery issues can be decided by the court and subsequently appealed, they are afforded a full and fair opportunity to litigate even if they are subjected to obstructive discovery habits from their opponents or denied discovery by the court. *See Porter v. Shah*, 391 U.S. App. D.C. 41, 46, 606 F.3d 809, 814 (2010); *Ellis v. Ford Motor Co.*, 628 F. Supp. 849, 856 (D. Mass. 1986).

Although defendants may not have given plaintiff relevant discovery, they nonetheless had a full and fair opportunity to litigate the case due to the other mechanisms available for obtaining the information. However, the court cannot find that they had a full and fair opportunity to litigate distributions that happened through the time of trial. Instead, the time of filing of the complaint of the 2009 Texas Lawsuit serves as a more appropriate cut off. Consequently, the court finds that

14

claims relating to any distributions made before the time of the filing of that complaint in October, 2009 are barred by *res judicata*. However, defendants have not shown that the court ruled on, or that the plaintiff could have actually litigated, claims concerning distributions that happened after the filing of the complaint.

### i. Whether the Brehon Claims Are Precluded

Plaintiff claims that the sale of Brehon is a breach of fiduciary duty by Rita, was fraudulently made, and was a fraudulent transfer. (Pl.'s Opp. S.M.F. ¶ 75.) Defendants, however, assert that any claim related to the sale of Brehon is barred by *res judicata*.

Plaintiff knew about the transfer of Brehon before filing her Complaint in the 2009 Texas Lawsuit. (Def.'s Supp'g S.M.F. ¶ 78.) The 2009 Texas Lawsuit contained claims relating to the sale of Brehon, including conversion. (Def.'s Supp'g S.M.F. ¶ 43.) These claims are still on appeal in Texas. (Pl.'s Opp. S.M.F. ¶ 71.)

Under the transactional test, any claim of breach of fiduciary duty, fraud, or fraudulent transfer arises from the same nucleus of operative fact and seeks redress for the same basic wrong as the claims relating to Brehon brought in the 2009 Texas Lawsuit that are now currently on appeal. Consequently, the doctrine of claim preclusion bars any claims relating to Brehon's sale from being brought in this court, even if they rely on a different legal theory than that advanced in the 2009 Texas Lawsuit.

In response, plaintiff claims that collateral attack on the prior order is appropriate because of the "discovery of new evidence that the transfer of the Marital Trusts [*sic*.] ownership in Brehon, LC did not actually occur until June of 2008." (Pl.'s Opp. 13.)

Generally, the judicial proceedings of one state are not subject to attack in another. "By the Constitution it is declared that full faith and credit shall be given in each state to the public acts,

15

records, and judicial proceedings of every other state, and the Congress may, by general laws, prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof." *Damon v. Webber*, 111 Me. 473, 477, 89 A. 734, 736 (1914) (quoting *Mills v. Duryee*, 11 U.S. (7 Cranch) 481, 483 (1813)) (quotation marks omitted). However, Rule 60(b) of the Maine Rules of Civil Procedure provides for relief from a judgment in certain situations, including when there is newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial or there has been fraud. M.R. Civ. P. 60(b). However, any such motion must be brought "not more than one year after the judgment, order, or proceeding was entered or taken." M.R. Civ. P. 60(b). Further, plaintiff's argument that she recently discovered evidence of fraud is currently being advanced in Texas Courts. *See Jones v. York*, 444 A.2d 382, 384-85 (Me. 1982) ("The general rule is that in cases of concurrent jurisdiction the court given priority is that which first exercises jurisdiction." (citation omitted)). Consequently, this court will not disturb the ruling and will defer any further action concerning Brehon to the Texas Courts.

### ii. Whether Plaintiff's Legal Theory Is Barred by *Res Judicata*

Next, defendants claim that the legal theory advanced by plaintiff in relation to improper transfers of Trust assets has already been rejected by Texas Courts. In the 2011 Judgment, Judge Les Hatch of the Lubbock District Court found, "Rita . . . has not spent for her own personal benefit from the Marital Trust principal or Family Trust income or principal beyond what is allowed under the applicable standards as set forth in those Trusts, namely what is necessary to maintain her accustomed standard of living after taking into account the funds reasonably available to her from other sources." (2011 Judgment at 2.) Judge Hatch came to the same conclusion in relation to distributions to Rita's children from the Family Trust.[2] (2011 Judgment at 2-3.)

---

[2] Judge Hatch held that the Marital Trust does not permit distributions to Rita's children and ordered the Family Trust to reimburse the Marital Trust for any such distributions. (2011 Judgment at 3.)

16

On appeal, the Texas Court of Appeals discussed the following concerning Rita's distributions of Trust assets to herself:

> While Kelly maintains Rita's standard of living prior to John's death was "frugal" and her current sources of income equal or exceed the $1,500.00 household budget she operated under during their marriage, this assertion overlooks Rita's testimony that, while they were married, John was generous with his gift-giving not only towards her but also his children. Furthermore, notwithstanding her income sources, Rita testified that, considering her expenses, she lives on less now than when she was married to John prior to his death.
>
> Further, John's use of the words "support" and "maintenance" in the Trust instruments evinces the creation of "support trusts." *See State v. Rubion*, 158 Tex. 43, 308 S.W.2d 4, 8-10 (1957). In such trusts, the trustee is obligated to make his or her decision whether to authorize a distribution after considering the following indicia: (1) the size of the trust estate, (2) the beneficiary's age, life expectancy, and condition of life, (3) his or her present and future needs, (4) the other resources available or the beneficiary's individual wealth, and (5) his present and future health, both mental and physical, to name a few. *See Keisling*, 218 S.W.3d at 744; *Estate of Dillard*, 98 S.W.3d 386, 395 (Tex.App.—Amarillo 2003, pet. denied). Thus, a distribution for Rita's health, support, and maintenance may be made from the Trusts only after a determination is made that the distribution meets the Trusts' requirements and "considering [Rita's] needs, age, condition, separate resources, the size of the Trusts, health and the like." *Id.*
>
> The record here contains evidence of the size of the Trusts' estates and the other resources available to Rita. Although the record contains some evidence of Rita's past and future expenses, there is no evidence concerning her age, life expectancy, condition of life, and health—mental or physical, that would have limited her ability to have made the distributions at issue in accordance with the terms of the Trusts. Accordingly, based on the foregoing, we agree with the trial court that Rita has not spent for her own personal benefit more than what is allowed under the distribution standards applicable to the Trusts.

*Duncan v. O'Shea*, 2012 Tex. App. LEXIS 6494, at *12-14.

In relation to the distributions of Family Trust assets to the children, the Texas Appellate Court found:

> Kelly next asserts the trial court erred by approving Rita's distributions to John's descendants under the Family Trust provisions because the distributions do not relate to their health, support, maintenance and education, and those distributions jeopardize Rita's financial security as evidenced by her credit card debt.
>
> Rather than explain why the distributions to John's descendants do not relate to their health, support, maintenance, and education, Kelly simply concludes the distributions do not meet the requirements of the Family Trust. Texas Rule of Appellate Procedure 38.1(h) requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(h). A failure to provide substantive analysis of an issue waives the complaint. *See Taylor v. Meador*, 326 S.W.3d 682, 684 (Tex.App.—El Paso 2010, no pet.); *Eastin v. Dial*, 288 S.W.3d 491, 502 (Tex.App.—San Antonio 2009, pet. denied). Accordingly, Kelly has waived this argument.
>
> In addition, Kelly's assertion that the distributions jeopardize Rita's financial security is unsupported by the record. Notwithstanding the Trusts' assets available for future distribution, Rita has personal assets of well over a million dollars. Further, $20,000.00 of the $25,000.00 credit card debt

17

> represents a running account used to purchase stock for her tack shop. Under these circumstances, we cannot say as a matter of law that the distributions violated the Family Trust's terms. Kelly's first issue is overruled.

*Duncan v. O'Shea*, 2012 Tex. App. LEXIS 6494, at *15-16.

Defendants claim it is plaintiff's theory that anyone receiving distributions from either of the Trusts had to have had no personal assets available to them at the time of transfer. To the extent that plaintiff is arguing that Rita must have spent all of her remaining assets before making any distributions to either herself or her children, the Texas Courts clearly rejected this argument. However, the Texas decisions do not preclude a finding that further transfers that were not analyzed by the Lubbock District Court were improper. These later transfers may have occurred with greatly differing factual circumstances. Indeed, part of the basis of the Appellate Decision was the lack of record evidence of many of the relevant factors relating to whether a distribution is improper. *Duncan v. O'Shea*, 2012 Tex. App. LEXIS 6494, at *14. There is clearly a question of fact concerning whether the distributions from the Trust complied with the standard as laid out in the Will and by the Texas Courts. Consequently, summary judgment on this basis is inappropriate.

### c. Whether Plaintiff's Damages Expert's Theory is Sound

Defendants similarly attack plaintiff's damages expert, Roderick C. Moe. Moe testified that it was his opinion that Rusty's Will provided that no distributee was qualified to receive any Trust Assets unless and until the distributee fully exhausted all other financial resources available to them. (Def.'s Supp'g S.M.F. ¶ 85.) Moe's testimony does not have any bearing on the court's analysis on the present motion. To the extent that defendants wish to have such evidence excluded, a motion in limine is the proper instrument for such a request.

### d. Defendants' Reliance on the Affidavit of W.J. Wade, Jr.

In her opposition to defendants' motion, plaintiff asserts that the court cannot consider the affidavit of W.J. Wade, Jr. (Pl.'s Opp. 1.) Wade is a Texas attorney who represented Rita and Kathleen in the 2009 Texas Lawsuit. Plaintiff contends that Wade is acting as an expert witness and because he was not designated as such, his affidavit should not be considered.

However, there is no indication that Wade is acting as an expert. He is merely providing his personal, first-hand knowledge of the litigation history between the parties.

Pursuant to Rule 1005 of the Maine Rules of Evidence, "The proponent may use a copy to prove the content of an official record--or of a document that was recorded or filed in a public office as authorized by law--if these conditions are met: the record or document is otherwise admissible; and the copy is certified as correct in accordance with Rule 902(4) or is testified to be correct by a witness who has compared it with the original. If no such copy can be obtained by reasonable diligence, then the proponent may use other evidence to prove the content." M.R. Evid. 1005. Wade's authentication of the documents attached to his affidavit are proper. The court may consider Wade's affidavit and the accompanying exhibits in making its decision on the current motions.

### e. Whether Plaintiff May Bring a Claim for Conversion

Finally, Defendants assert that plaintiff has failed to state a claim for conversion. (Def.'s Mot. Summ. J. 22.) Specifically, defendants claim that plaintiff has not produced any evidence to show that she was in possession of, or had the right to possess, any of the Trusts' property at the time of the alleged conversion.

In reviewing plaintiff's conversion claim in the 2009 Texas Lawsuit, the Texas Court of Appeals discussed:

"The unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, is in law a conversion." *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971). The elements of a cause of action for conversion are: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights; and (3) the defendant refused plaintiff's demand for return of the property. *Hunt v. Baldwin*, 68 S.W.3d 117, 131 (Tex.App.—Houston [14th Dist.] 2001, no pet.).

Kelly's action for conversion fails because there is no evidence Kelly had possession of, or was entitled to possession of the Trusts' assets. Rita is the Marital Deduction Trust's sole beneficiary and, by its terms, no distributions are to be made to anyone else during her lifetime. Under the Family Trust, she is "primary" beneficiary. As Trustee for the Trusts, she holds title to, and has the right to possession of, the Trusts' income and corpus. *See Becknal v. Atwood*, 518 S.W.2d 593, 598 (Tex.Civ.App.—Amarillo 1975, no writ).

At best, John's *Will* gives his descendants, including Kelly, the *possibility* of a distribution from the Family Trust during Rita's lifetime or an inheritance from the Marital Deduction and Family Trusts' assets upon Rita's death. *See Davis v. Davis*, 734 S.W.2d 707, 709-10 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) ("The possibility of inheritance does not create a present interest or right of title in property.") As such, John's descendants hold equitable title to the Family Trust's corpus and *may* be entitled to a distribution if Rita exercises her discretion as Trustee in accordance with the Trust's terms. *Rekdahl v. Long*, 417 S.W.2d 387, 391 (Tex. 1967). Further, both Trusts terminate upon Rita's death and John's descendants may inherit the Trusts' assets, if any remain. Thus, John's descendants have a remainder interest in any property that *might* remain in either Trust upon Rita's death. *See Black's Law Dictionary* 1317-18 (8th Ed. 2004) (A remainder interest is "[a] future interest arising in a third person . . . who is intended to take after the natural termination of the preceding estate.") The terms of the Trusts make clear that John intended to provide for his wife *as the sole or primary beneficiary* during her lifetime and the entire corpus of both Trusts could be expended for Rita's benefit during her lifetime at her sole discretion as Trustee. *See Eisen v. Capital One*, 232 S.W.3d 309, 313-14 (Tex.App.—Beaumont 2007, pet. denied).

We have examined the record and Kelly has failed to produce any evidence that she owns, has possession of, or is entitled to possession of any income or corpus belonging to either Trust. Neither has she adduced any evidence that Rita assumed or exercised dominion and control over the Trusts' property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Kelly's rights. Accordingly, because evidence of an element of conversion is completely lacking, the trial court properly granted summary judgment in Rita's favor on Kelly's cause of action for conversion. Kelly's second issue is overruled.

*Duncan v. O'Shea*, 2012 Tex. App. LEXIS 6494, at *17-19.

Since that decision, plaintiff has become a co-trustee of both of the Trusts. She is bringing the conversion claim against the defendants in her capacity as trustee, not personally. Because the Trusts had possession of the assets in question, plaintiff has stated a claim of conversion in her capacity as trustee. Thus, summary judgment is inappropriate. To the extent that plaintiff is bringing a conversion claim on her own behalf concerning transfers that happened before Rita's

20

death, however, the Appellate Judgment makes clear that she did not have any right to possess the Trust property during her mother's life. Thus, plaintiff's personal claims from the time before she became a trustee cannot stand because of *res judicata*. However, to the extent that her claims relate to transfers made at time when she was entitled to distributions from the trust, after Rita's death, plaintiff had a present possessory interest sufficient to state a claim for conversion

### iii.     Claims Related to Rita's Life Insurance Policies

In their motion for partial summary judgment, defendants attacked plaintiff's claims relating to two life insurance policies on Rita's life. (Def.'s Mot. Summ. J. 21.) At oral argument, defendants waived argument relating to these claims, acknowledging there was a question of material fact. Consequently, the court will not address arguments relating to the policies at this stage.

### iv.     Whether Rita Can Be Reimbursed from the Trusts for Legal Fees

Both parties assert that the Lubbock District Court decided the issue of whether Rita could pay her legal fees from Trust assets in the 2011 Judgment. The 2011 Judgment simply provides, "The Court FINDS and ORDERS each party to bear their own attorneys fees and costs incurred in this matter." (2011 Judgment at 3.) This does not indicate any decision concerning whether Rita may be reimbursed from the Trusts for the cost of her legal defense or must pay for such fees from her own personal assets, only that each party was not entitled to reimbursement of their fees from the other. Consequently, neither plaintiff nor defendants have shown that the issue has already been decided in the 2011 Judgment such that *res judicata* applies to bar relitigation. Whether any such reimbursement was proper will be addressed at trial.

21

## IV. CONCLUSION

For the reasons set forth above, the motions pending before the court are to be disposed of in accordance with this order.

The clerk shall make the following entries on the docket:

Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment is hereby GRANTED.

Plaintiff's Motion to Strike Defendants' Affirmative Defenses is hereby DENIED.

Plaintiff's Motion to Strike Defendants' Expert Witness Designation is hereby DENIED.

Plaintiff's Motion to Strike Defendants' Reply Brief in their Motion for Partial Summary Judgment is hereby GRANTED.

Defendants' motion for partial summary judgment is hereby GRANTED in part and DENIED in part.

Plaintiff's Motion for Summary Judgment is hereby DENIED.

SO ORDERED.

DATE: April 3, 2018

_____
John O'Neil, Jr.
Justice, Superior Court

ENTERED ON THE DOCKET ON: 4/4/18

22

ALFSC-CV-14-157


ATTORNEY FOR PLAINTIFF:

BRIAN CHAMPION, ESQ.
LIBBY O'BRIEN KINGSLEY & CHAMPION
62 PORTLAND ROAD, SUITE 17
KENNEBUNK ME 04043

PRO HAC VICE ATTORNEY FOR PLAINTIFF:

JEFFREY DUNCAN, ESQ.
DUNCAN LAW, PC
PO BOX 7896
JUPITER FL 33468-7896



ATTORNEYS FOR DEFEDANTS KATHLEEN M. O'SHEA, BRIAN CONNOR O'SHEA
AND JOHN J.C. O'SHEA:

GEORGE DILWORTH, ESQ.
JEANA MCCORMICK, ESQ.
AMY KAY OLFENE, ESQ.
DRUMMOND WOODSUM
84 MARGINAL WAY, SUITE 600
PORTLAND ME 04101-2480



ATTORNEY FOR DEFENDANT KELLYBEGS, LLC:


ANDRE DUCHETTE, ESQ.
TAYLOR MCCORMACK & FRAME, LLC
30 MILK STREET, 5TH FLOOR
PORTLAND ME 04101

STATE OF MAINE                                          SUPERIOR COURT
YORK, ss.                                               CIVIL ACTION
                                                        DOCKET NO. CV-14-157


KELLEY ANN O'SHEA,


Plaintiff,


v.                                                      **ORDER**


KATHLEEN M. O'SHEA,
BRIAN CONNOR O'SHEA,
JOHN J. O'SHEA III, and
KILLYBEGS, LLC,


Defendants.


## I. Background

Plaintiff Kelley Ann O'Shea ("Kelley" or "the plaintiff") brings this action against Kathleen M. O'Shea, Brian Connor O'Shea, and John J. O'Shea III (collectively "the individual defendants"), as well as Killybegs, LLC, a foreign LLC organized under the laws of Texas. At issue, in part, is the O'Shea family vacation home at 168 Kings Highway, Kennebunkport, Maine ("the vacation property").

This is not the first lawsuit involving the parties. Kelley previously filed a suit in Texas state court against her late mother, Rita O'Shea ("Rita") alleging that she misused assets from a trust formed from the estate of John O'Shea Jr., who was Kelley's father and Rita's husband. The case went to trial and was affirmed by a panel of the Court of Appeals of Texas. *Duncan v. O'Shea*, 2012 Tex. App. LEXIS 6494, 23, 2012 WL 3192774 (Tex. App. Amarillo Aug. 7, 2012). Although the court addressed Rita's income

1

from the vacation property, there was no substantive adjudication as to rights in the property. After the Texas litigation commenced, Rita formed Killybegs, LLC ("Killybegs") and conveyed the vacation property to Killybegs. (Compl. ¶¶ 30-32.) The plaintiff alleges this transfer violated the trust and was made in an effort to shield assets from a potential judgment in the litigation. Rita died in 2013. The defendants are all named as Directors of Killybegs and have assumed control of managing the vacation property. (Compl. ¶¶ 53, 65, 68; Ex. H.) In this capacity, the defendants have entered contracts to maintain the property, paid bills, and visited Maine on several occasions. (Pl.'s Ex. A-1.)

The plaintiff's complaint in this case brings nine counts related to the transfer of the vacation property and management of Killybegs, including multiple counts for breach of fiduciary duty, breach of contract, fraud, conversion, and a claim under the fraudulent transfers act, 14 M.R.S. § 3575. The complaint requests that the court impose a constructive trust and award punitive damages. Before the court are Killybegs's and the individual defendants' motions to dismiss for improper venue, lack of personal jurisdiction, and forum non conveniens. Killybegs also moves separately to dismiss Counts I, II, III, V, VI, VII, and IX. (Def. Killbegs Mot. Dismiss 8-10.)

## II.     Discussion

### A. Venue

The general venue statute provides:

Personal and transitory actions . . . shall be brought, when the parties live in the State, in the county where any plaintiff or defendant lives; and when no plaintiff lives in the State, in the county where any defendant lives; or in either case any such action may be brought in the county where the cause of action took place.

2

14 M.R.S. § 501. The defendants argue that because none of the parties are Maine residents, venue is improper in this court. The plaintiffs respond that venue is appropriate under Section 501 "where the cause of action took place." There is, however, an added qualification: Section 501 requires either the plaintiff or the defendant reside in Maine. *See Gaeth v. Deacon*, 2009 ME 9, ¶ 17, 964 A.2d 621.

While "[t]he general venue statutes are silent as to the venue of personal transitory actions where neither the plaintiff nor the defendant is a resident of Maine," this does not mean nonresidents have no available venue. 2 Harvey, *Maine Civil Practice* § 0:20 at 67 (3d ed. 2011). Rather, actions between nonresidents may be maintained in the county where the defendant can be found and served with process. *Id.* Foreign corporations and LLCs may be served at a "place of business of the corporation within the state." M.R. Civ. P. 4(d)(9)(a). Under another applicable venue statute, a corporation "may sue and be sued in the county in which they have an established place of business." 14 M.R.S. § 505. Because the LLC owns and the individual defendants operate the vacation property in Kennebunkport, venue is proper in York County.

Ultimately, the defendants object to personal jurisdiction and the convenience of litigating this matter in Maine. *See Estate of Hoch v. Stifel*, 2011 ME 24, ¶ 30, 16 A.3d 137 (setting aside defendant's venue challenge as a personal jurisdiction challenge and declining to address venue separately). The court considers personal jurisdiction and forum non conveniens in turn.

### B. Personal Jurisdiction

Maine conducts a two-step analysis to determine whether exercise of personal jurisdiction over a defendant is proper. The court first applies the state long-arm statute,

3

then determines whether exercising jurisdiction comports with due process. *Stifel*, 2011 ME 24, ¶¶ 22-25, 16 A.3d 137.

Under Maine's long-arm statute, a defendant submits to the jurisdiction of the courts if the cause of action arises from "[t]he transaction of any business within this State" or "[t]he ownership, use or possession of any real estate situated in this State." 14 M.R.S. § 704-A(2)(A), (C). Maine exercises jurisdiction to the maximum extent permitted by due process. *Id.* "Due process is satisfied when: (1) Maine has a legitimate interest in the subject matter of the litigation; (2) the defendant, by his or her conduct, reasonably could have anticipated litigation in Maine; and (3) the exercise of jurisdiction by Maine's courts comports with traditional notions of fair play and substantial justice." *Stifel*, 2011 ME 24, ¶ 25, 16 A.3d 137. The plaintiff must make a prima facie showing on the first two prongs and the defendant bears the burden on the third prong. The court construes the alleged facts in the plaintiff's favor. *Fore v. Benoit*, 2012 ME 1, ¶ 10, 34 A.3d 1125.

The individual defendants argue that personal jurisdiction is lacking because their only contact with Maine is membership in Killybegs, and Killybegs's only contact is ownership of the vacation property. According to the defendants, the plaintiff's case concerns events that occurred in Texas involving a Texas trust and citizens of Texas, California, and Florida. The defendants maintain they could not have reasonably anticipated litigation in Maine and therefore asserting personal jurisdiction would contravene due process. (Def.'s Mot. Dismiss 5-7.)

4

The long-arm statute is met. The defendants are members of Killybegs and Killybegs owns and rents the vacation property. Ownership of real property is sufficient to support jurisdiction under the long-arm statute. 14 M.R.S. § 704-A(2)(A); *Hawley v. Murphy*, 1999 ME 127, ¶ 6, 736 A.2d 268. By operating an LLC that rents property and enters contracts in Maine, the defendants have also transacted business in the state. 14 M.R.S. § 704-A(2)(C); *Cavers v. Houston McLane Co.*, 2008 ME 164, ¶ 16, 958 A.2d 905 (negotiating a single employment contract with a Maine resident sufficient to meet "transacting business" standard). The individual defendants have sufficient contacts with Maine through Killybegs such that assertion of personal jurisdiction as to the LLC also extends to each of them.[1] Not all of the plaintiff's claims encompass the individual defendants' contacts with Maine. Rita, now deceased, created the LLC and made the allegedly wrongful transfer to Killybegs. Since that time, however, the plaintiff alleges the individual defendants have entered contracts to maintain and rent the property, mismanaged the LLC, and have denied the plaintiff income from the property that would otherwise be realized from trust distributions. This is sufficiently related to Maine to support specific jurisdiction. *See Fore*, 2012 ME 1, ¶¶ 14-15, 34 A.3d 1125 (holding personal jurisdiction proper where nonresident defendant never physically present in Maine and entered a single transaction with a Maine resident); *see also Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 716 (1st Cir. 1996) (holding specific jurisdiction

---

[1] The individual defendants do not raise this argument, but the "fiduciary shield doctrine," which protects members of a corporate entity from being subject to personal jurisdiction through a business entity, has not been adopted in Maine or embraced by local federal courts. *See RF Techs. Corp. v. Applied Microwave Techs., Inc.*, 369 F. Supp. 2d 24, 32 (D. Me. 2005). Even if applied, the individual defendants have more significant contacts with Maine than mere membership.

5

established where there was a "meaningful link" between the defendant's contacts with the forum state and the plaintiff's cause of action).[2]

Turning to the due process analysis, the court considers Maine's interest in the litigation, whether a suit was foreseeable to the defendants, and whether asserting jurisdiction would comport with traditional notions of fair play and substantial justice. *Cavers*, 2008 ME 164, ¶ 18, 958 A.2d 905.

First, Maine has a strong interest in adjudicating claims related to real property located within the state. *See Commerce Bank & Trust Co. v. Dworman*, 2004 ME 142, ¶ 15, 861 A.2d 662. Second, litigation was foreseeable to the defendants. At issue here, in part, is ownership of the vacation property and whether the LLC has been properly managed. (Compl. 5-6.) The individual defendants emphasize that the operation and management of Killybegs has occurred primarily in Texas, but they do not deny that they have entered Maine to maintain the property. (Def.'s Mot. Dismiss 5-7.) By operating the LLC, visiting Maine multiple times, and generating revenue from renting the vacation property, the defendants have clearly "purposefully availed" themselves of "the privilege of conducting activities within [Maine], thus invoking the benefits and protections of its laws." *Murphy v. Keenan*, 667 A.2d 591, 594 (Me. 1995) (citation and internal quotation marks omitted). The prospect of being haled into a Maine court was or should have been reasonably foreseeable to the defendants.

Lastly, the defendants fail to show that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. Despite the defendants'

---

[2] Having found specific jurisdiction, the court need not address the plaintiff's contention that Maine has general jurisdiction over the defendants. The defendants' contacts are likely not sufficiently continuous and systematic to support general jurisdiction. *Reed & Reed, Inc. v. George R. Cairns & Sons, Inc.*, 519 F. Supp. 2d 148, 153 (D. Me. 2007).

6

representations about the location of witnesses and evidence, the defendants have not established this suit would be "so gravely difficult and inconvenient" that they would be at a "severe disadvantage in comparison" to the plaintiff. *Caluri v. Rypkema*, 570 A.2d 830, 833 (Me. 1990) (citations omitted). The defendants' contacts with Maine were not "random, fortuitous, or attenuated" and in any event constitute the type of "less extensive activity . . . required where the cause of action arises out of or in connection with the defendant's forum-related activity." *Id.* As noted, the plaintiff's causes of action are largely related to the defendants' primary contact with Maine: management, control, and rental of the vacation property. The individual defendants' remaining arguments go to the merits of the case, and are not appropriate at this juncture. (Def.'s Reply Pl.'s Opp. Mot. Dismiss 3-6.) Viewing the facts alleged in the light most favorable to the plaintiff, the exercise of personal jurisdiction comports with due process. *See Foreside Common Dev. Corp. v. Bleisch*, 463 A.2d 767, 769 (Me. 1983) (negotiating purchase and sale agreement for Maine real estate, scheduling a closing, and opening and closing a bank account sufficient to meet due process requirements).

The defendants stress the fact that neither they nor the plaintiff are Maine residents and even if personal jurisdiction exists, this court should not decide the controversy. The "usual rule" is that "Maine courts are open to anyone, resident or nonresident, to bring transitory actions against any defendant within the jurisdiction of the Maine courts, subject only to the rule of forum non conveniens." *Tyson v. Whitaker & Son, Inc.*, 407 A.2d 1, 3 n.5 (Me. 1979). The court next addresses forum non conveniens.

**C. Forum Non Conveniens**

7

Where jurisdiction is proper, the doctrine of forum non conveniens allows a court discretion to nonetheless dismiss the case. "Dismissal must be predicated upon the trial court's initial determination that dismissal will further the ends of justice and promote convenience of the suit for all parties." *MacLeod v. MacLeod*, 383 A.2d 39, 41 (Me. 1978). To that end, an available and alternative forum "is essential before a Maine court can dismiss a case under the doctrine of forum non conveniens." *Corning v. Corning*, 563 A.2d 379, 380 (Me. 1989).

Maine has adopted the factors enunciated by the Supreme Court in conducting a forum non conveniens analysis. These include (1) the private interest of the litigant; (2) ease of access to sources of proof; (3) availability of witnesses; (4) practical hurdles to conducting the trial in Maine, including cost and time constraints; (5) enforceability of a judgment; (6) obstacles and advantages to a fair trial; (7) availability of an alternative forum; and (8) the public interest. *MacLeod*, 383 A.2d at 42 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Although the plaintiff may not elect to file suit in an inconvenient forum in order to "vex, harass, or oppress" the defendant, the plaintiff's choice of forum "should rarely be disturbed" unless the equities weigh strongly in the defendant's favor. *Id.*

The defendants are correct to point out that the plaintiff's case largely concerns persons, events, and evidence outside the State of Maine. Yet forum non conveniens is not available simply because the matter could be litigated more conveniently in another forum. Rather, in order to dismiss under the doctrine, the court must find (1) that an alternative forum exists for the plaintiff to press her claim and (2) that the equities weigh strongly toward dismissal. *MacLeod*, 383 A.2d at 42.

8

The defendants accuse the plaintiff of forum shopping because the statute of limitations has run in Texas. Indeed, regardless of what law applies to the plaintiff's substantive claims, if the suit remains here, Maine's statute of limitations controls. *Johanson v. Dunnington*, 2001 ME 169, ¶ 6, 785 A.2d 1244 ("Under traditional choice of law rules, the forum state generally applies its own statute of limitations to a cause of action, even though it may apply the substantive law of another state.") In Texas, breach of fiduciary duty, breach of contract, and fraud claims all have a four-year statute of limitations. Tex. Civ. Prac. & Rem. Code § 16.004 (Lexis 2013). Although the statute begins to run at the time of the breach or relevant act, Texas recognizes the "discovery rule" exception. *Pitman v. Lightfoot*, 937 S.W.2d 496, 510 (Tex. App. 1996). The discovery rule tolls the statute until the plaintiff learns of the breach or relevant act, provided the plaintiff was not previously unaware as a result of negligence or lack of diligence. *Id.*

In addition to possible statute of limitations problems, the plaintiff contends that a Texas court lacks the power to reform or cancel a deed for property located in Maine. *See Kelly Oil Co. v. Svetlik*, 975 S.W.2d 762, 764 (Tex. App. 1998) ("[I]t is well-settled . . . that Texas courts have no power or jurisdiction to adjudicate title to interests in real property located in another state.") The court later qualified that rule: "Texas courts may, however, compel a party over whom it has jurisdiction to execute a conveyance of a real property interest situated in another state." *Id.* In the *Kelly Oil* case, the Texas court concluded jurisdiction was lacking because the plaintiff could not establish title to the property. The court distinguished an action for breach of contract or conversion whereby

9

the court could adjudicate the obligations of the parties and order the appropriate relief, including ordering a party within the court's jurisdiction to convey real property. *Id.*

The *Kelly Oil* case appears to indicate that a Texas court could order the relief the plaintiff seeks. There is no genuine ambiguity as to title: the vacation property either belongs to the trust, as the plaintiff claims, or remains under control of the LLC. The issue is whether the transfer to Killybegs was proper and the consequences that flow from the management of the property by the defendants. The plaintiff asserts that breaches of contract, fiduciary duty, and conversion by the defendants have deprived her of income from the property. Because a Texas court could compel Killybegs to transfer the property to the trust (which was also formed in Texas), this case seemingly falls into the latter category of cases in which a Texas court would have jurisdiction. *See Kelly Oil*, 975 S.W.2d at 764. The plaintiff could thus pursue her claims in Texas and a judgment would be entitled to full faith and credit in Maine. U.S. Const. art. IV, § 1.

Nonetheless, there is no guarantee a Texas court would apply the discovery rule to toll the statute of limitations or interpret the *Kelley Oil* case in the same manner. This does not meet the threshold requirement that an alternative forum must be available "before a Maine court can dismiss a case under the doctrine of forum non conveniens." *Corning*, 563 A.2d at 380. Even if dismissal would "promote the convenience of the suit," the convenience must be for "all parties" and ultimately serve the interests of justice. *MacLeod*, 383 A.2d at 41. Absent compelling equities in favor of the defendants, the plaintiff's choice of forum ought not be disturbed. *Id.* at 42. Dismissal for forum non conviens is inappropriate in this case.

## D. Killybegs's Motion to Dismiss Counts I, II, III, V, VI, VII, and IX

10

Under M.R. Civ. P. 12(b)(6), the court views "the facts alleged in the complaint as if they were admitted." *Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶ 2, 54 A.3d 710. The court will grant the motion only "when it appears beyond a doubt that the plaintiff is not entitled to relief under any set of facts that he might prove in support of his claim." *Doe v. Graham*, 2009 ME 88, ¶ 2, 977 A.2d 391.

Killybegs argues Counts I, II, III, and V do not name Killybegs as a defendant. The court cannot dismiss these counts as to Killybegs because the plaintiff has not named Killybegs as a defendant. The plaintiff's complaint clearly states those counts apply to the other defendants. The court acknowledges Killybegs's reading of the complaint.

As to Count VI, Killybegs argues that a conversion action cannot be maintained where the property converted is real property. (Def. Killybegs Mot. Dismiss 9.) Killybegs construes this count too narrowly; in addition to wrongfully obtaining title to the vacation property, the plaintiff alleges the defendants have converted trust funds and rental proceeds to maintain and operate the property. (Compl. ¶¶ 166-173.) These money proceeds may be the subject of a conversion action. Horton & McGehee, *Maine Civil Remedies* § 18-4 at 357 (4th ed. 2004).

Killybegs argues Count VII fails to state a claim under Section 3575 of the Maine Fradulent Transfer Act. Section 3575 defines a fraudulent transfer as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor.

14 M.R.S. § 3575. As alleged in the complaint, Rita transferred the vacation property to Killybegs in an effort to avoid creditors. Killybegs argues that the statute only

contemplates claims against a debtor, who in this case was Rita. Killybegs, as transferee, lacked the necessary intent to hinder, delay, or defraud creditors. (Def. Killybegs Mot. Dismiss 9.) Killybegs does not assert the defense that the vacation property was transferred in good faith and for reasonably equivalent value. *See* 14 M.R.S. § 3579 (2)(B) (transferee subject to judgment under the Act unless transferee took as a bona fide purchaser). As a result, Killybegs may still be liable as transferee. Count VII states a claim against Killybegs.

Lastly, Killybegs moves to dismiss Count IX for punitive damages, arguing the plaintiff has not alleged ill-will or actual malice necessary to support a punitive damages award. The plaintiff alleges Killybegs acted "with actual or implied malice" and points to the various fraudulent transactions to which the LLC was a party. (Compl. ¶¶ 197-202.) The plaintiff allegations, if true, state a claim for punitive damages as a matter of law. *Bratton v. McDonough*, 2014 ME 64, ¶ 25, 91 A.3d 1050.

## III.    Conclusion

The court concludes venue is proper, Maine has personal jurisdiction over the defendants, and because the court is not satisfied Texas is a viable alternative forum, the court declines to dismiss the action pursuant to the doctrine of forum non conveniens. Killybegs's motion to dismiss Counts I, II, III, V, VI, VII, and IX is denied.

12

The entry shall be:

The defendants' motions to dismiss are hereby DENIED.


SO ORDERED.

DATE: April 22 , 2015

John O'Neil, Jr.
Justice, Superior Court

13

CV-14-157

ATTORNEYS FOR PLAINTIFF:
BRIAN CHAMPION
LIBBY O'BRIEN KINGSLEY & CHAMPION LLC
62 PORTLAND RD UNIT 17
KENNEBUNK ME 04043

JEFFREY W DUNCAN
DUNCAN LAW P C
P O BOX 7896
JUPITER FL 33468-7896

ATTORNEYS FOR DEFENDANTS: JOHN JC, KATHLEEN M & BRIAN CONNOR
OSHEA
GEORGE DILWORTH
JEANA M MCCORMICK
DRUMMOND WOODSUM
84 MARGINAL WAY SUITE 600
PORTLAND ME 04101

ATTORNEY FOR DEFENDANT: KILLYBEGS LLC
ANDRE G DUCHETTE
TAYLOR MCCORMACK & FRAME
30 MILK STREET 5TH FLOOR
PORTLAND ME 04101